## NATIONAL LABOR RELATIONS BOARD v. WALWORTH CO., Inc.

### No. 7692.

Circuit Court of Appeals, Seventh Circuit.
Dec. 9, 1941.

Robert B. Watts, of Washington, D. C., I. S. Dorfman, of Chicago, Ill., and Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Hilda D. Shea and Marcel Mallet-Prevost, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

David R. Clarke, John Harrington, and Albert J. Smith, all of Chicago, Ill., for respondent.

Before SPARKS, and KERNER, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

We are concerned here with only one question, whether respondent has violated Section 8(1), (2) and (3) of the National Labor Relations Act, 29 U.S.C., Supp. V, Title 29, § 151 et seq., 29 U.S.C.A. § 151 et seq., by discriminatory discharge of eleven of its employees because of union membership in what is hereinafter termed the Amalgamated, or other concerted activity. The Board's order, which petitioner seeks to have enforced, includes a finding that respondent has also wrongfully dominated and supported its employees' labor organization designated herein as the Local. Respondent frankly admits that, inasmuch as the latter finding was based upon substantial evidence that respondent had not completely disestablished its relationship with the Local, a company dominated union, it will not question the propriety of the order in this respect. Respondent does insist, however, that the record contains no substantial evidence to support the finding of wrongful discharges. Our review, therefore, is confined to the latter feature.

In its complaint the Board averred that respondent had discriminatorily discharged thirty-six of its employees, three for engaging in concerted activities with other employees and thirty-three because of union activities. Later, by amendment, two employees were added and four omitted. The Examiner found that eighteen of the thirty-four had been wrongfully, discriminatorily discharged and that the complaint should be dismissed as to the remaining sixteen. The Board decided that the evidence did not support the Examiner's recommendation as to seven but sustained his finding as to eleven. These are properly divided into two groups: first, three laid off in the pattern department March 27, 1937 and second, eight laid off between May and October, 1937.

▮ The first three, Kubelius, Colberg and Murphy, were employed in the metal pattern department. At the time of their suspension, March 27, 1937, there was no union or union promotion in the plant. None of the three was engaged in any such activity. There were sixteen employees in this department, in addition to apprentices, and all of them signed a petition for an increase in wages.

The Board, prosecuting the complaint and hearing the evidence, resolved every one of many conflicts in evidence in favor of its own witnesses. It accepted the employees' version of their conversation with Superintendent Beckman following the presentation of the petition, although Murphy did not recall it and Kubelius attributed the remarks to another gentleman not then present and though both the superintendent and foreman denied it. The pattern-makers were interviewed in Beckman's office in groups of five and six. In the last were Kubelius, Colberg and Murphy. The Board found that Beckman, after reading the petition, declared that the only method by which respondent at that time could grant the requested increase would be by laying off three of the sixteen men. The Board concluded that the three men were laid off because they had signed the petition for an increase of wages.

But all sixteen of the pattern employees had signed and neither Kubelius nor Colberg had anything more to do with the petition than the others. Murphy had helped prepare it. The only persons in the department who had less seniority than Colberg were the apprentices and one Minor, who did work different from that done by Colberg. Kubelius had been in respondent's employ for sixteen years, but he was just learning the type of labor that he was rendering at that time and the apprentices were doing what they had formerly done. Colberg was not essentially a pattern-maker but a machinist. The foreman told the superintendent that he could best dispense with Colberg and Kubelius and that if it was necessary to lay off a third man, he would suggest Murphy, who, he said, was slower than the others. The lay-offs occurred just as a decline in business began,— part of a nation-wide recession. The Board in its brief suggests that these three men were chosen "purely at random" and the circumstances indicate that they were laid off simply because they were the three that could best be spared. Petitioner calls our attention to the fact that three new employees had been hired in the pattern shop about three months prior to the lay-off and were retained, but the record is silent as to whether they were doing the same work or merely apprentice labor.

The record seems to us utterly devoid of evidence justifying the Board's inference that these three men were discharged because of their activity in signing a petition for a wage increase. Had that been the reason all sixteen would have been discharged.

▮ From May to October, 1937, respondent's business substantially decreased. It laid off during this period one hundred men, suspensions of eight of whom were found by the Board to have been discriminatory. In reaching this conclusion it resolved the conflicts in testimony in favor of the complaint and, though respondent made a persuasive showing of logical reasons for suspension of the eight employees, a careful analysis of the record leads to a conviction that the Board had before it substantial evidence to support its finding and order in this respect. We shall not go into great detail but shall refer to some of the circumstances upon which the Board relied.

In the gray iron foundry Hamilton, Trussen, Lay and Debord were laid off. Hamilton was recording secretary of Amalgamated and wore its button. Respondent had repeatedly indicated its antagonism to this union and its approval of the local union. One of the foremen asked Hamilton what employees had attended the meetings of Amalgamated and what had taken place at the meetings. Hamilton declined to answer. The same foreman asked him what he thought about labor organizations. Trussen, a chipper, joined the Amalgamated on April 28, 1937 and thereafter actively solicited fellow employees to join and was elected "guide." He wore the union button in respondent's plant. He was asked to join the Local but never did so. One of the foremen told him that he wished that he, Trussen, would drop the union; that "he might be laid off if he did not do so." Lay became a member of Amalgamated and likewise took an active part in soliciting members, wearing an Amalgamated button. He was asked to join the other union but refused to do so.

The foreman told him that an employee would shortly ask him to sign a membership card in the latter union. Consequently when such an employee appeared, Lay "signed up." He testified that the foreman told him "he was fired"; that respondent had spotters all over the plant and knew who went to the meetings and that he was told by a foreman that "they were going to sift them all out." Debord became a member of Amalgamated in May and solicited fellow employees to join. He, too, was asked to join the local union but did not do so. He did not wear his button in the plant but did wear it in the presence of his foreman at other places. Debord was laid off in October shortly after the foreman had said to Lay that he was going to "sift out fellows" attending meetings of Amalgamated and that he had "another fellow down there he had to go down and lay off that same morning." The Board found that in these remarks the foreman was referring to Debord and that the latter's discharge was on account of his membership in Amalgamated.

In the packing and stockhouse department Dolieslager became a member of Amalgamated on April 28, 1937. He solicited memberships. In May, one of the foremen told him that he, Dolieslager, was the only one in the brass-packing section "who did not join the company union" and that this was "putting the foreman on the spot" and that if he did not join, he would probably be "out with the other guys looking for a job." Dolieslager testified that he signed with the Local to please his foreman; that the foreman told him from time to time that respondent "did not want to have anything to do with Amalgamated." Blazier testified that his foreman told him that he and Dolieslager would be laid off if they did not cease their activities in Amalgamated. Blazier had become a member in April and was vice-president. He solicited memberships. A foreman had asked him to become a member of the other union and had spoken to him of his, the foreman's, animosity toward organized labor. After the foreman had told him that he and Dolieslager would be laid off if they did not end their activity in Amalgamated, the foreman further promised to try to "straighten it out," if Blazier would cease his activities on behalf of Amalgamated. This warning, Blazier said, was repeated a month later.

In the Tapping Inspection and Blank Stock Departments, Bunce and Skutnick were laid off, as the Board found, wrongfully. Bunce joined the Amalgamated on April 30, 1937 and became active in its affairs, accompanying the president on visits to employees soliciting them to join. He wore his button in the plant. An inspector who checked the work of others and for whose activities the Board found respondent responsible, told Bunce that he understood the C. I. O. was coming to town and "we want to get the jump on the skunks and turn them out" and urged him to join the local union. He finally acquiesced. In September, 1937, the foreman told him that he would have to be laid off and when Bunce inquired as to the reason, he was told that he should "not ask any questions, that the less he said, the better off he was." The Board found from the evidence that Bunce was better than an average workman. Skutnick joined Amalgamated in May, 1937, and helped obtain members of the organization. He was asked to join the Local, his foreman saying to him "that C. I. O. is coming in and we want to run the rats out of town." When in September Skutnick protested at being laid off, the foreman told him that "the less he said about it, the better off he would be." From all these and other circumstances the Board concluded that each of these eight men was laid off because of his union activity.

■ The ever present controversy as to whether certain inspectors, foremen and sub-foremen could by their actions and statements bind the respondent is presented. But under the facts of this record and the now well established rule, we can not say as a matter of law that the Board was in error in considering such testimony. International Ass'n of Machinists v. N.L.R.B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50.

■ The evidence as to all the eight men is sharply conflicting. But, in view of the exclusive nature of the Board's function in resolving conflicts of testimony, N. L. R. B. v. Aluminum Products Co., 7 Cir., 120 F.2d 567; Valley Mould & Iron Corp. v. N. L. R. B., 7 Cir., 116 F.2d 760; N. L. R. B. v. Reynolds Wire Co., 7 Cir., 121 F.2d 627, we are without right to weigh the evidence.

The order of the Board will be modified by elimination of those paragraphs relating to Kubelius, Colberg and Murphy. As so modified it will be affirmed and enforced.