## NATIONAL LABOR RELATIONS BOARD v. JOHNSON STEEL & WIRE CO.
### No. 3835.

Circuit Court of Appeals, First Circuit.
April 1, 1943.

Louis Newman, Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, Ruth Weyand, and Ramey Donovan, Attys., all of Washington, D. C., for National Labor Relations Board.

Ernest L. Anderson, of Worcester, Mass., for respondent on review.

Before MAHONEY and WOODBURY, Circuit Judges, and PETERS, District Judge.

MAHONEY, Circuit Judge.

This is a petition for the enforcement of an order issued by the National Labor Relations Board against respondent pursuant to Section 10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S. C.A. § 151 et seq., ordering respondent in the usual manner to cease and desist from discouraging membership in Steel Workers Organizing Committee (C.I.O.) or in any other labor organization of its employees; to offer three of its employees immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority or other rights and privileges; to make whole these employees for any loss of pay they may have suffered by reason of respondent's discrimination against them, and to post notices.

This case turns on the alleged unfair labor practices of respondent in relation to these employees. The Board charges that respondent laid them off because of their union activities and thus committed violations of Section 8(1) and (3) of the Act.

The employees named in the Board's order are Philip Ferland, Thomas Dyson, Sr., and John Cox. We shall consider the evidence concerning them in that order.

(1) Philip Ferland was employed by respondent on August 12, 1940, and worked exclusively on frame 47 until it was temporarily shut down on January 25, 1941. During February and the greater part of March he worked regularly as an operator and helper on other frames and during the first three weeks of March he worked regularly on frame 48. According to the employment schedule posted on respondent's bulletin board, Ferland was scheduled to work on frame 48 as a helper on March 23, 24 and 25. The Board found that Ferland was transferred from frame 48 to unskilled work on March 24th and the reason for this transfer was the union activities engaged in by Ferland. He was replaced by another employee with less experience. The incident which occasioned the transfer was the distribution to a fellow employee of a copy of a labor newspaper called "Steel Labor News". The Board found that while Ferland was discussing with his fellow employee an article contained in the issue referred to, Wahlstrom, a foreman in respondent's employ, came upon them and became involved in a heated discussion with Ferland in which he called Ferland an insulting name. Ferland continued in unskilled work after his transfer until March 27, 1941, at which time the Board found that he was discharged by respondent. There was evidence introduced which tended to show that one of respondent's foremen admonished Ferland to give up his union activities. The evidence indicated that Ferland was one of those most actively engaged in union affairs.

The respondent introduced evidence to show that it had an express policy not to interfere with union activities of its employees; that in the case of Ferland it transferred him to unskilled work because of a vulgar remark made by him to Wahlstrom; that Ferland was unable to get along with his fellow employees; that it did not discharge Ferland but rather that he voluntarily quit his employment, and that Ferland in a report made to the Massachusetts Board of Unemployment Insurance gave as a reason for his right to compensation the fact that he was laid off for lack of work.

(2) Thomas Dyson, Sr., was employed by respondent on September 22, 1940. He

is a tinner and galvanizer with a long record of experience in this field. He was employed as an operator on frame 47. On January 25, 1941, when frame 47 was temporarily shut down, Dyson was transferred to work on other frames and occasionally to unskilled work. On February 21, 1941, he was taken off frame 48 and was offered unskilled work at a lower rate of pay, which he refused. This did not constitute a voluntary quitting of his employment but was rather the refusal to exercise the option given to employees to accept unskilled work to make up their work week if it so happened that their particular job was not open. He accepted reemployment as a laborer on March 17, 1941, and worked in that capacity until he was laid off on March 27th. Dyson joined the union on March 12, 1941. He is the employee to whom Ferland gave a copy of "Steel Labor News" and was present at the dispute between Ferland and Wahlstrom. He was active in soliciting members for the union in respondent's tinning and galvanizing department. The Board found that on March 27, 1941, respondent's chauffeur delivered to Dyson's home a card stating "no work until further notice" and concluded that Dyson was also discharged because of his union activities.

Respondent says that it offered Dyson employment as an unskilled worker because of his inefficiency as an operator. It states that upon his re-employment he worked for a short time at unskilled work and then voluntarily quit. It denies that it sent him a lay-off slip on March 27, 1941.

(3) John Cox was employed by respondent on January 1, 1941, as an electrician's helper and on February 2nd was promoted to a position as sweeper at an increase in pay. He was scheduled to work on March 28th and 29th. On March 27th he received at his home a slip informing him that he was laid off and that there would be "no work until further notice". He was engaged in union activities and sought to solicit members for the union. Cox was a colleague of Ferland in their joint effort to unionize respondent's plant. The Board found that Cox telephoned George S. Forsberg, respondent's personnel director, and inquired as to the reason for his lay-off, and it accepted the testimony of Cox which was to the effect that Forsberg told him he had been talking too much union.

Respondent introduced evidence to show that Cox was laid off because his work was unsatisfactory and that Forsberg did not give as a reason for Cox's discharge his so-called union activities. Forsberg testified that he told Cox that he did not know the reason for his lay-off and that it was Cox who suggested that he might have been laid off for union activities.

There is much other evidence in the record dealing with the discharge of these employees, but we believe it would serve no useful purpose to summarize it in detail. We have carefully considered the entire record and are of the opinion that if the Board believed, as it did, the evidence introduced in behalf of the petitioner, it could reasonably have come to the conclusion that respondent discharged these men for union activities and that such discharge constituted a violation of the Act.

Our only inquiry is to determine whether there is substantial evidence to sustain the conclusions of the Board. It is not for us to reweigh the evidence or to place ourselves in the position of a trier of fact in the determination of the issues here involved. The evidence in the case at bar is entirely conflicting, but it is not for us to resolve such conflicts of testimony; National Labor Relations Board v. Armour & Co., 10 Cir. 1942, 129 F.2d 316; National Labor Relations Board v. Swift & Co., 8 Cir. 1942, 129 F.2d 222; National Labor Relations Board v. Goodyear Tire & Rubber Co. of Alabama, 5 Cir. 1942, 129 F.2d 661; National Labor Relations Board v. Walworth Co., Inc., 7 Cir. 1941, 124 F.2d 816; that is the peculiar function of the Board and it has been repeatedly held that the Circuit Courts should not usurp the powers granted to it by the National Labor Relations Act. National Labor Relations Board v. Link-Belt Co., 1941, 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Waterman Steamship Corp., 1940, 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704. We are satisfied in the case at bar that there is ample evidence to support the conclusions reached by the Board.

A decree will be entered enforcing the order of the Board.