## NATIONAL LABOR RELATIONS BOARD
### v. FRANKS BROS. CO.
#### No. 3872.

Circuit Court of Appeals, First Circuit.
July 27, 1943.

990

Malcolm A. Hoffmann, Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and David Findling, all of Washington, D. C., and Herman Lazarus, of Philadelphia, Pa., for petitioner.

Benjamin E. Gordon, of Boston, Mass., for respondent.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

Pursuant to Section 10(c) of the National Labor Relations Act (49 Stat. 449, 29 U.S.C.A. 151 et seq.), the National Labor Relations Board has petitioned us for enforcement of its order of October 8, 1942, against Franks Bros. Company, a Massachusetts corporation, with its principal office and place of business at Lawrence, Massachusetts.

The respondent is engaged in the manufacture, sale and distribution of men's clothing. Samuel Franks is its President, Treasurer and principal stockholder. Abraham A. Franks, his son, is its Secretary. No question is raised in this case as to the interstate character of respondent's business.

The Board found that the respondent on June 12, 1941, and thereafter, refused to bargain collectively with the Amalgamated Clothing Workers of America (C.I.O.), (hereinafter called the union), as the exclusive representative of its employees in an appropriate bargaining unit within the meaning of Section 8(5) of the Act, and interfered with, restrained and coerced its employees in the exercise of their rights guaranteed in Section 7 of the Act, thereby committing an unfair labor practice within the meaning of Section 8(1). The Board issued its usual cease and desist order ordering the respondent upon request to bargain collectively with the union as the exclusive representative of the employees, and to refrain from interfering with, restraining or coercing its employees and to post notices to this effect.

The respondent challenges the sufficiency of the evidence in support of the Board's conclusions that the union was the exclusive representative of its employees and that it coerced or interfered with their union activities. It contends that a majority of its employees did not designate the union as its exclusive bargaining representative as of June 12, 1941, but that even if this were so, nevertheless, the union did not as of the date of the hearing of this cause before the Trial Examiner have a majority due to the voluntary quitting of some of respondent's employees, and that, therefore, the Board's order that it bargain with the union despite its loss of a majority is invalid.

■ The evidence introduced in behalf of the Board indicated that the union had engaged in an organizational campaign commencing in January, 1941, and that by the early part of June a majority of the employees had signed cards designating the union as its bargaining representative.

On June 12, 1941, Frank Lerman, Assistant Manager of the Boston Joint Board, had a conference with Samuel and Abraham Franks at their place of business in Lawrence. Louis Hascall, a union organizer, deputized Lerman to discuss the matter of collective bargaining with the respondent's officers because he was of the opinion that Lerman, through his acquaintance with the Franks, would have a better chance of success in any negotiations with them. At this conference Lerman sought to persuade the Franks to agree to bargain with the union but was unsuccessful. The evidence as to what took place at this conference is conflicting. Lerman testified that he informed the Franks that the union had a majority but that they refused to bargain with it. He further testified that Abraham Franks said that it would be advisable to wait until Christmas before reaching a decision because he was not certain what would be done with the business. The Franks denied that Lerman told them that the union had a majority. Samuel Franks' version is that Lerman was asked whether the union had a majority and that he replied in the negative. Abraham Franks stated that Lerman, in response to a question as to whether the union had a majority, replied that he did not know. A second conference was held between Lerman and Abraham Franks in Boston at the Bradford Hotel during the following week. Lerman testified that in response to a question put to him by Abraham Franks as to whether the union would win an election if one were held, he replied that a majority of the employees had signed cards designating the union as its representative. Lerman stated that Abraham Franks reiterated his suggestion that the union leave respondent alone until Christmas because he didn't know what was going to be done with, the business. Lerman said that he told him then that unless the parties could reach some agreement the union would petition the National Labor Relations Board to certify it as a majority representative. Franks denied that he had stated that the matter should be deferred until Christmas. On the basis of the conflicting testimony the Board concluded that on June 12, 1941, the union had a majority of the cards signed by the employees of respondent designating it as the bargaining representative; that upon Lerman's request that the respondent bargain with the union, it refused and sought to delay the matter un-

til some considerable time thereafter; that he had notified respondent that the union had a majority and that the respondent by its attempt to delay negotiations until Christmas did not bona fide doubt the majority status of the union but merely refused to bargain. Respondent on the other hand categorically denied the testimony offered by Lerman. In the light of this conflicting testimony it is clear that the appellate court is not in a position to weigh the testimony of the witnesses, nor is it permitted to do so. National Labor Relations Board v. Link-Belt Co., 1941, 311 U. S. 584, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Waterman Steamship Corp., 1940, 309 U.S. 206, 60 S. Ct. 493, 84 L.Ed. 704; National Labor Relations Board v. Johnson Steel & Wire Co., 1 Cir., 134 F.2d 785, decided April 1, 1943.

Respondent asserts that the testimony given by Lerman in this regard is unreliable and that throughout examination and cross-examination by counsel he never stated that he told the respondent that the union had a majority. It contends that the Trial Examiner improperly elicited this information from him by asking him leading questions. The fact that the Trial Examiner injected himself into the proceedings by asking Lerman certain questions was not on this record improper. As was said in Bethlehem Steel Co. v. National Labor Relations Board, 74 App. D.C. 52, 120 F.2d 641, 652:

"It is the function of an examiner, just as it is the recognized function of a trial judge, to see that facts are clearly and fully developed. He is not required to sit idly by and permit a confused or meaningless record to be made."

On June 19, 1941, the union filed a petition for a certification of it as the bargaining representative of respondent's employees. As a result of conferences held at the Regional Office of the National Labor Relations Board, in which counsel for the parties participated, an agreement was entered into for a consent election to be held on July 25, 1941. The Board introduced testimony to show that after the notice of the election was posted in respondent's plant, supervisory employees of respondent sought to undermine the majority status of the union and to prejudice the employees of respondent against it by making statements to the effect that if the union were successful in the forthcoming

election, respondent would close down its plant. As a result of this, the union claimed that it cancelled the scheduled election and thereafter it filed charges with the Board alleging that the respondent committed unfair labor practices.

During July, August and September of 1941, various conferences were held and correspondence exchanged between the respondent and the Board in an effort to settle the dispute. The Board requested the company to post notices stating that "the company hereby advises its employees that there will be no shutdown of the plant caused by the employees selecting a union". Respondent was willing to post the notice but with the additional statement: "However, if the union wins their election and makes excessive demands on the company, the company may cease operations and close the plant." The condition which respondent sought to impose by its request that it be permitted to append its additional statement to the Board's notice was rightly considered by the Board coercive. Abraham Franks testified that at the time he had no idea that the union would make excessive demands nor did he under the then existing conditions expect to close the business. Why respondent should want to qualify the Board's language is unclear unless it thought that the complete statement would have some effect upon the free choice of the employees in their selection of a bargaining agent. We think the Board properly concluded that this was evidence of a continued refusal on the part of the respondent to bargain collectively with its employees.

■ Respondent contends that the union did not represent a majority of its employees, despite the fact that out of eighty employees who worked for respondent, forty-six had signed cards designating the union as its representative. Its contention is based upon the fact that certain of the cards signed by the employees designated the union and others designated the Boston Joint Board of the Amalgamated Clothing Workers of America. We find no merit in this contention. The Boston Joint Board is composed of seven members from each of the thirteen locals in Boston and vicinity. The National Executive Office of the union consists of representatives of the Joint Boards throughout the country. With this obvious tie-up between the Boston Joint Board of the Amalgamated Workers and the union, it cannot be said

that in designating one or the other the employees expected to be represented by different unions. We think the Board was entirely justified in concluding that the cards designating the union or the joint board could be counted together in determining whether the union had a majority status.

Respondent makes the contention that the union did not have a majority on June 12, 1941, because some of the employees who signed the designation cards signed under the impression that at some future date they would be allowed to vote for their bargaining representative. Guy Salerno, a union organizer, testified that he explained to certain of the employees that in accordance with the practise of the union an election to determine whether it had a majority of the employees of respondent might be held. We do not see that any of the evidence in this case supports the proposition that the employees designated the union on the condition that they would at some future time be permitted to vote secretly for their bargaining representative.

■ Respondent urges that certain statements alleged to have been made by its supervisory employees to the effect that if the union were successful in the election the plant would shut down, cannot be attributed to it because it had expressly instructed these employees to refrain from interfering with the employees in their union activities. We think the rule laid down in H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309, is applicable to the case at bar. The statements which the Board found were made by respondent's supervisory employees were clearly coercive and were intended to have the effect of disparaging the union and destroying the employees' confidence in it. As was there said (311 U.S. at page 521, 61 S.Ct. at page 323, 85 L.Ed. 309):

"The question is not one of legal liability of the employer in damages or for penalties on principles of agency or respondeat superior, but only whether the Act condemns such activities as unfair labor practices so far as the employer may gain from them any advantage in the bargaining process of a kind which the Act proscribes. To that extent we hold that the employer is within the reach of the Board's order to prevent any repetition of such activities and to remove the conse-

quences of them upon the employees' right of self-organization, quite as much as if he had directed them."

Swift & Co. v. National Labor Relations Board, 10 Cir., 1939, 106 F.2d 87.

As to respondent's violation of Section 8(1), it may be said that the evidence of its attempt to dissuade its employees from remaining in the union by threatening them with a shut down of its plant is pertinent in determining whether respondent interfered with, restrained or coerced its employees in the exercise of their rights under the Act. On the basis of this record we find that there is substantial evidence to support the Board's conclusion.

We now consider respondent's contention that the Board's order is invalid and improper on the ground that the union lost its majority because of the voluntary quitting of some of its employees. The Board in its opinion in reply to this contention makes the following statement in a footnote:

"The respondent introduced into evidence its pay roll of March 5, 1942, by which it appears, as the respondent asserted, at oral argument, that a sufficient number of union members had left the respondent's employ by that date to affect the Union's majority. This alleged loss of majority is not determinative of the remedy to be ordered. We have consistently held that the only means by which a refusal to bargain can be remedied is an affirmative order requiring the employer to bargain with the Union which represented a majority at the time the unfair labor practice was committed."

The respondent contends that the rule enunciated by the Board is not applicable to the facts in this case but that National Labor Relations Board v. Fansteel Metallurgical Corporation, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, should govern our decision. In that case the union was the bargaining representative of the employees. Respondent refused, however, to negotiate with it. Thereupon a sit down strike resulted and the employer discharged those employees who participated in the strike. The Board ordered the employer to bargain with the union and the Supreme Court in reversing the Board stated (306 U.S. at pages 261, 262, 59 S.Ct. at page 498, 83 L.Ed. 627, 123 A.L.R. 599):

"In view of the change in the situation by reason of the valid discharge of the 'sitdown' strikers and the filling of positions with new men, we see no basis for a conclusion that after the resumption of work Lodge 66 [the union] was the choice of a majority of respondent's employees for the purpose of collective bargaining. The Board's order properly requires respondent to desist from interfering in any manner with its employees in the exercise of their right to self-organization and to bargain collectively through representatives of their own choosing. But it is a different matter to require respondent to treat Lodge 66 in the altered circumstances as such a representative. If it is contended that Lodge 66 is the choice of the employees, the Board has abundant authority to settle the question by requiring an election."

We are of the opinion that the Fansteel case is distinguishable from the case at bar. Because of the violence of the striking employees the employer properly discharged them. The union, by the action of its members, forfeited its right to be recognized as the bargaining representative even though at a prior date a majority of the employees had designated it as their representative. An act had intervened from the date upon which it could be said that the union was the majority representative which permitted the employer to discharge a number of its employees and thereby deprive the union of its status as the majority representative.

Respondent cites also National Labor Relations Board v. Karp Metal Products Co., Inc., 2 Cir., 1934, 134 F.2d 954, 955, in support of its position. There it was determined that the union had a majority of employees on June 3, 1941. The Board's order was entered on July 8, 1942. On March 18, 1942, the respondent and the employees' union (a competing union) moved to determine whether the C.I.O. Local which represented a majority of the employees at the earlier date was still a majority union. In refusing this motion the Board said: "The allegations of these petitions, even if true, are subsequent to and in no way affect the acts complained of, or the legal conclusion to be drawn therefrom". The Second Circuit took the position that while it was not for the appellate court but for the Board to determine how far the respondent's earlier unfair labor practice continued to vitiate any choice of a representative by its em-

ployees, nevertheless, the Board should have exercised its judgment and could not ignore the issue when squarely presented to it. The court was of the opinion that its decision was not contrary in any way to National Labor Relations Board v. Lorillard Company, 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380. While we find considerable merit in the position taken by the Second Circuit, we are of the opinion that the decision in the Lorillard case is in opposition to the view expressed in the Karp case, supra.

In the Lorillard case before the Board's order was handed down, a motion for leave to intervene was filed by a competing union and a petition for rehearing before the trial examiner was filed by the respondent. It is thus clear that the matter was still pending before the Board as in the Karp case. The Board in refusing to consider the subsequent change in the majority status of the earlier majority union expressed itself in the same language which it used in the Karp case: "The allegations of these petitions, even if true, are subsequent to and in no way affect the acts complained of or the legal conclusion to be drawn therefrom". 16 N.L.R.B. 684, 699. It went on to say (p. 700), quoting from Matter of Inland Steel Co., 9 N.L.R.B. 783:

"If an order to bargain collectively cannot be deemed an appropriate remedy for the refusal to bargain collectively unless the S.W.O.C.'s majority is kept intact until the Board can issue a decision, the plain policy and intent of the Act will be defeated. The respondent would be permitted further to evade the obligation of Section 8(5) by profiting from the discouraging effects of its already accomplished violation of that very obligation. We cannot concede the validity of such a doctrine of futility, and we hold that to effectuate the policies of the Act, the respondent's refusal to bargain must be remedied by an order to bargain, based on the majority obtaining on the date of the refusal to bargain."

The Supreme Court reversed the Sixth Circuit 117 F.2d 921, and affirmed the Board on the ground that:

"The Board had considered the effect of a possible shift in membership alleged to have occurred subsequent to the Lorillard's unfair labor practice. But it had reached the conclusion that in order to effectuate the policies of the Act, Lorillard must remedy the effect of its prior unlawful refusal to bargain by bargaining with the union shown to have had a majority on the date of Lorillard's refusal to bargain. This was for the Board to determine, and the court below was in error in modifying the Board's order in this respect." 314 U. S. at page 513, 62 S.Ct. 397, 86 L.Ed. 380.

In the Karp case, the Second Circuit stated that while it was for the Board to effectuate the policies of the Act by issuing an appropriate order, nevertheless, the respondent was entitled to a judgment of the Board as to whether respondent's unfair labor practices continued to vitiate any choice of a representative by its employees. But it appears from the Lorillard case that the only consideration which the Board gave to the possible shift in the majority was to say that it would ignore such a shift in order to effectuate the policies of the Act.

The case before us presents a somewhat different factual situation in that the loss of majority was not due to a shift of employee allegiance from one union to another. Had this been the fact there would be no question but that the Lorillard case would govern our decision. The Board might properly assume that there existed a causal connection between the unfair labor practices and the loss of the union's majority. International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 83, 61 S.Ct. 83, 85 L. Ed. 50; National Labor Relations Board v. Bradford Dyeing Association, 310 U.S. 318, 340, 60 S.Ct. 918, 84 L.Ed. 1226. It appears in the case before us that the loss of a majority was due to a voluntary quitting on the part of certain employees of respondent. From the Board's treatment of respondent's argument in this respect, however, it would seem that it is of the view that the loss in majority may be traced to the refusal to bargain with the union on June 12, 1941. The respondent's dilatory tactics, its refusal to recognize the union as a bargaining representative, and its campaign against the union deprived it of the opportunity of strengthening its organization. It demonstrated the union's inability to reach an agreement with the employer with the result that as time went on the enthusiasm of its members waned and it made it more difficult for the union to capture the allegiance of other employees, either old employees who had previously not joined, or new employees who came on after the unfair labor prac-

tices were committed. The Board might reasonably conclude that had the union been recognized and installed as bargaining representative of the employees, as the law required, it probably would have retained its majority status by accessions from these sources, despite its loss of members resulting from normal labor turnover. In other words, the Board has taken the position that in a proceeding of this nature involving a violation of Section 8(5), it is imperative in order to effectuate the purposes of the Act, that an employer gain no advantage from his dilatory tactics in refusing to bargain collectively with a majority union. The fact that it may be shown that by lapse of time the union had been unable to retain its majority is not a sufficient basis for refusing to order affirmatively that the respondent bargain with the union. We are of the view that the language of the Supreme Court in the Lorillard case compels us to affirm the Board once it has reached such a conclusion.

A decree will be entered enforcing the order of the Board.