**L. C. CASSIDY & SON, INC., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 16940.**

United States Court of Appeals
Seventh Circuit.

Aug. 6, 1969.

Rehearing En Banc Denied
Sept. 16, 1969.

D. C. Duck, James S. Haramy, Cadick,
Burns, Duck & Neighbours, Willis K.
Kunz, Kunz & Kunz, Indianapolis, Ind.,
for petitioner.

Marcel Mallet-Prevost, Asst. Gen.
Counsel, Arnold Ordman, Gen. Counsel,
Dominick L. Manoli, Associate Gen.
Counsel, Allison W. Brown, Jr., Ronald

William Egnor, Attys., N.L.R.B., Washington, D. C., for respondent.

Before CASTLE, Chief Judge, KNOCH, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

KNOCH, Senior Circuit Judge.

Pursuant to § 10(f) of the National Labor Relations Act, Title 29 U.S.C. § 160, the petitioner, L. C. Cassidy & Son, Inc., seeks to review and set aside an Order of the National Labor Relations Board issued June 4, 1968, reported at 171 NLRB No. 136. The respondent Board seeks enforcement of that Order.

The proceedings before the Board began with a complaint issued July 28, 1967, on charges by Sheet Metal Workers' International Association, Local 503, AFL–CIO, that the petitioner had interfered with, restrained and coerced its employees in violation of § 8(a) (1) of the Act, discriminatorily discharged two employees in violation of § 8(a) (3) and refused to bargain in violation of § 8(a) (5).

After a hearing on February 2, 1968, the Trial Examiner recommended dismissal of the § 8(a) (3) and § 8(a) (5) allegations. The Trial Examiner's decision covers the two discharges in great detail and concludes that both employees were discharged for cause and not in violation of the Act. He found, over several serious objections by petitioner, that when the demand to bargain was made on March 2, 1967, the Union had obtained valid authorization cards from a majority of 17 of the 32 employees in the unit. He recommended a bargaining order.

On March 2, 1967, the Union had written petitioner's president, Donald Cassidy, that a majority of the installation employees had authorized Sheet Metal Workers' International Association, Local 503, to represent them in collective bargaining, offering to prove this majority status through a disinterested third person and requesting recognition and a meeting to negotiate a contract. The following day the Union filed a petition for certification by the Board.

Under date of March 7, 1967, the petitioner's attorney, Willis K. Kunz, replied that petitioner did not believe that the Union represented a majority. As an election which would settle the issue had already been requested by the Union, Mr. Kunz thought it would serve no purpose to attempt proof of representation by other means.

The Board conducted an election on May 5, 1967, at which 10 votes were cast for and 18 against the Union. One ballot was challenged. The Union filed objections to the election charging improper offer of benefits to employees individually and as a group in addition to withholding of work from other employees all allegedly to discourage Union membership. The Trial Examiner found that petitioner's unlawful conduct during the pre-election period caused the dissipation of the Union's majority and invalidated the election.

The Trial Examiner found several violations of § 8(a) (1). It was the custom for petitioner to hold meetings with employees on Monday mornings at least twice monthly to discuss working problems and complaints. From March 13, 1967, until the election, the Union was a subject of discussion at these meetings. Six of the employees testified to various statements made. The Trial Examiner credited that testimony. He found that most of the comments attributed to Donald Cassidy, although unfavorable to union organization, were within the protection of the Act. He found no unlawful threats of reprisal. He did find implied promises of benefits conditioned on renunciation of the Union.

Although Mr. Cassidy did say several times that he could promise no benefits because of the Union campaign, he once stated he could give the employees "more" than the Union. In connection with a complaint on "Electric heat batt rates," he said he could not promise anything, but would look into it. On March 14, 1967, three employees vis-

ited Mr. Cassidy in his office to ask what benefits they might receive if they "dropped the Union action," and were told he could not promise them anything until the union action was officially dropped. At the March 20, 1967 meeting of employees, Mr. Cassidy mentioned the visit of the three employees and when one of them said the employees wished to meet elsewhere without management present, to determine whether they wanted the union, Mr. Cassidy offered the petitioner's conference room for this discussion. He also reminded them at one point that some months before he had suggested their forming a grievance committee and expressed regret that a third party, the Union, had to come in to do what the employees could do for themselves. After the employees met alone, they reported that they did not really want the Union if they could secure some benefits and correct existing problems. Mr. Cassidy replied that he could not promise anything but that they knew he was a man of his word who acted in good faith. The Trial Examiner found that Mr. Cassidy's remarks as a whole held out a promise of benefits if the employees rejected the Union and that his statements were tantamount to suggesting a committee as an alternative to the Union.

Petitioner argues that these statements at worst are only ambiguous and should be construed as within the protected area of § 8(c) in the light of the facts that the employees themselves initiated many of the discussions, there were continual assurances that the employees were free to vote as they wished and there was an absence of any threat of reprisal. However, the context of Mr. Cassidy's comments at the meetings also included references to possible closing of the plant for economic reasons and statements that in the event of a strike the employees could stay out till "hell froze over" before he would give any of his profit to anyone and that strikers would be replaced and would "no longer have employment." In the light of all of the circumstances we do not consider the Board's construction of the statements as implying an offer of benefits unreasonable.

As petitioner argues, mere interrogation of employees without threat or intimidation concerning union membership is not per se a violation of the Act (absent anti-union background and not associated as part of a pattern of conduct hostile to unionism) and standing alone will not support a finding that § 8(a) (1) has been violated. National Can Corp. v. NLRB, 7 Cir., 1967, 374 F. 2d 796, 806. However, the inquiries made by supervisory employees here were not standing alone but occurred in an atmosphere of restrained but clearly evident disapproval of a union. The various conversations between supervisors and employees raised a number of issues of credibility. Conceding that credibility presents issues for the trier of the facts, petitioner argues that Donald Cassidy, a careful man, anxious not to jeopardize his company's position, explained repeatedly to his employees that he could not promise benefits, and that it is incredible that he would allow himself to tell an employee, as employee David McPeak testified, that those who had been trying to bring in the Union were trouble-makers who were on their way out. It was David McPeak who also testified to hearing a statement by petitioner's dispatcher, Michael Bindhammer, who is a supervisor, at the conclusion of a telephone call, on the first working day after the election, that he was "going to get back at these people" who gave him "trouble over the union." We cannot agree that Mr. Mc-Peak's evidence was so incredible as to justify overruling the Board's findings on the issues of credibility.

The Board found that a majority had been achieved by the Union. The majority was a small one and resulted from resolution of a number of close questions in favor of the Union. It was stipulated that there were 32 employees in the appropriate bargaining unit. Signed cards of 18 employees were received in evi-

dence. Sixteen of the cards were printed as follows:

AUTHORIZATION FOR REPRESENTATION BY AMERICAN FEDERATION OF LABOR and CONGRESS of INDUSTRIAL ORGANIZATIONS

I desire to be represented by a Union which is part of the AFL–CIO and I hereby designate the AFL–CIO and/or its appropriate affiliates as my Bargaining Agent in matters of wages, hours and other conditions of employment.

Two read:

SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION
Affiliated with AFL–CIO

AUTHORIZATION FOR REPRESENTATION

I, the undersigned, hereby authorize the SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, or any affiliated Local Union thereof, to represent me for purposes of Collective Bargaining, and in my behalf, to negotiate and conclude all agreements as to hours of labor, wages, and other conditions of employment.

The petitioner argued that the 16 general AFL–CIO cards did not validly designate the Union as the collective bargaining agent of the employees. The testimony of Felix McCartney, the Regional Director of Region 10 of the AFL–CIO, comprising the State of Indiana, indicated that at the time of the hearing 129 international unions were affiliated with the AFL–CIO and that he had the authority to decide with which affiliate a group of employees would be identified after they signed AFL–CIO authorization cards. Mr. McCartney had previously testified that he asked employee Virgil Harris, who telephoned him requesting an organizer be sent, to find out what union the employees desired and that Mr. Harris had later told him the employees preferred the Sheet Metal Workers' International Union.

Petitioner contends that with two exceptions Mr. McCartney in fact, and not the individual employees, selected their bargaining representative. A number of the employees testified at the hearing that they designated the AFL–CIO as their bargaining agent. One employee testified that he had never heard of the Sheet Metal Workers' union until after he had signed the card. The General Counsel for the Board notes that there could have been no question at the time of the election which union was under consideration and that there was ample time for any objections and renunciations of authorization, none of which were made. In reply petitioner points to the number of employees who voted against the Union.

The Trial Examiner in rejecting petitioner's objection to the 16 cards (one of which he eliminated from the count on other grounds) relied on Nubone Company, Inc., 62 NLRB 322 (1945) which was enforced by a *per curiam* opinion of the Third Circuit, 1946, 155 F.2d 523, in which no reference is made to this point. In *Nubone*, 62 NLRB 325, the Board notes that two general AF of L authorizations were counted despite the fact that the signers did not subsequently sign cards on which the particular union was designated by name. Although the Board agreed with the Trial Examiner's findings, 62 NLRB 326, it observed that omission of these two cards did not affect the union's majority status. Here omission of the general AFL–CIO cards would completely destroy the Union's majority. The same result would follow elimination of the cards signed by the seven employees who testified that they chose the AFL–CIO when they were asked at the hearing.

In *Nubone* the Board referred in a footnote to the same two cases cited by the General Counsel here for the proposition that designation of a parent organization is a valid designation of its affiliate: (1) NLRB v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226, 1940, reversed the First Circuit, 1939, 106 F.2d 119, 123, which

denied enforcement of a bargaining order based on a majority of cards designating the Textile Workers Organizing Committee as bargaining representative, in part because it did not appear that any such organization as the TWOC as a branch or affiliate of the CIO, whose organizers were working in the plant, ever came into actual existence. The First Circuit also found no substantial evidence to support the Board's finding that a majority of the employees signed up to become members of a union under that name. The employer in *Bradford* was promoting a company union called the Federation to which many employees adhered. The Supreme Court, 310 U.S. 339, 60 S.Ct. 918, refers to the testimony of the TWOC State Director that a charter or local is not essential to membership in TWOC as such charter or local is granted only after recognition. The Supreme Court notes from the testimony that the TWOC had a list of 482 names (a majority) taken from a check of original cards stipulated to have been signed prior. to the date on which the employer recognized the Federation as exclusive representative. (2) NLRB v. Franks Bros. Co., 1 Cir., 1943, 137 F.2d 989, was affirmed in 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 435, 1944, in which no reference is made to this particular issue. Some of the Franks employees designated the "Amalgamated Clothing Workers of America," and others designated the "Boston Joint Board of the Amalgamated Clothing Workers of America." The First Circuit describes the Boston Joint Board as composed of seven members from each of the 13 locals in the Boston vicinity and the National Executive Office as consisting of representatives of the Joint Boards throughout the country. The Court concluded that it could not be said that in designating one or the other the employees expected to be represented by different unions.

Although we do not decide this point, we think these instances are a far cry from designating the AFL–CIO with its 129 affiliates.

With respect to the two cards secured by representations that they were designed to obtain an election, the testimony of the two employees involved presented a narrow border-line case, on the facts of which the Board might have held either way.

As stated in NLRB v. Dan Howard Mfg. Co., 7 Cir., 1968, 390 F.2d 304, 309, the test is whether the statements made are clearly calculated to create a belief that the only purpose of the card is to obtain an election. Thus as the Court there stated, the subjective intention of the signer and his expressed state of mind do become relevant to a determination whether a misapprehension was knowingly induced. In the recent NLRB v. Gissel Packing Company cases decided June 16, 1969, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, the U. S. Supreme Court agrees with the Board's own warnings in Levi Strauss, 172 NLRB No. 57, 68 LRRB 1338, 1341 and note 7, 1968, that Trial Examiners should not indulge in mere mechanical application of the rule in Cumberland Shoe Corp., 144 NLRB 1268, 1963, that an unambiguous card must be counted unless the employee was told it would be used solely for an election. The Board there states the test to be whether the totality of circumstances surrounding the card solicitation is such as to add up to assurance that the cards will be used for no purpose but to secure an election.

Lowell Glen Maynard testified that he read the card which he signed, that he had never been in a union before, that he told Virgil Harris who asked him if he was "for the union" that he was and would sign a card. He also testified that Virgil Harris said there would be an election, that just signing the cards would not bring the union in, and that he did not know there might be bargaining without an election. He did say that Virgil Harris told him the purpose of the card was to have a union represent the employees.

William Elmer Floyd testified that he received a card from Virgil Harris which he signed and turned in at a later

meeting. He said he did not read the card at the time he signed it, that Virgil Harris told him efforts were being made to get a union, that better than 50% of the employees must sign the cards before there would be any need to have an election. Mr. Floyd had previously been a member of a union, whose name he did not know, at the Ford Motor Company for two or three months. He said he never heard of the Sheet Metal Workers before and did not know what union he would be under when he signed the card, that he didn't pay that much attention to it. Later he said that he thought the purpose of the card was to see whether there would be a need to have an election and he signed it because he "thought that if they wanted an election, let them have one." He later attended a number of meetings, however and discussed the union with others. He made no effort to withdraw his card. Subsequently he was promoted to a supervisory position and did not vote in the election.

Benjamin F. Underwood was shown one of the general AFL–CIO cards which bore the name "Bennie Underwood." It was dated January 30, 1967. Mr. Underwood testified that he had signed one card, and only one card, around that time but not the one shown to him, that he never spelled his name that way. Walter G. Gallagher, who was stipulated to be a handwriting expert, testified that this card was "very probably" signed by the same hand as other signatures known to be by Mr. Underwood and it was his opinion that it was "more than highly probable" that one writer wrote all the signatures, that he did not render a positive opinion because no signature provided him for comparison showed the name "Bennie" as written on the card in question. The Trial Examiner excluded this card from the count although he thought that Mr. Underwood was probably mistaken in his testimony. The Board took the position that Mr. Underwood's unequivocal testimony that he had signed a card was a valid authorization of the Union to represent him. In a similar situation, Dubois Fence & Garden Co., Inc., 1966, 156 NLRB 1003, 1004, the Board adopted the same course of action. We are uneasy about this "practical" disposition of a questioned signature.

The petitioner invites our attention to NLRB v. Midwestern Mfg. Co., Inc., 10 Cir., 1968, 388 F.2d 251, 255, where the Trial Examiner rejected the signed but undated card of employee Raymond Jones for want of substantial evidence that he had signed prior to the bargaining demand. The Board found that his testimony sufficiently identified the date of signing and that the basis for rejection was invalid. The Tenth Circuit held that it was incumbent on the Union to present affirmative evidence that it held Mr. Jones' card prior to the critical date, October 10th. Mr. Jones' testimony was somewhat more vague as to date of signature than Mr. Underwood's. The latter when asked if he could recall whether he signed on January 30, 1967, replied that he "couldn't say" but agreed that it was "around that time" and when asked if in the "very young part of the year" said "somewhere in that neighborhood." The request for recognition in this case was made on March 2, 1967. In Midwestern, there was credible evidence that the union filed with the Board prior to September 11th cards signed up to September 3rd but Mr. Jones' card (and two others) supposed to have been signed August 31st were not filed with the Board until December 9th. The employee who had solicited the card was not called as a witness nor his absence explained. Petitioner reminds us that the employee to whom Mr. Underwood returned the card he did sign, the AFL–CIO Regional Director who initially received the signed cards, and the Union representative who handled the organizing activities after receiving the signed cards from the Regional Director, all were witnesses at the hearing; yet none testified respecting knowledge that Mr. Underwood had signed a card prior to March 2nd.

In *Midwestern*, the Tenth Circuit felt that the Board's conclusions with respect to the critical date could not be permitted to rest on such flimsy evidence and speculation and that the Trial Examiner had properly rejected the card. Enforcement of the Board's order was declined.

■ However, we consider counting Mr. Underwood's card (apart from the fact that it was a general AFL–CIO card) in this case to be at worst harmless error. The testimony of the expert consisting of a highly detailed analysis of the signatures available for comparison, letter by letter, would have formed an adequate basis for a finding that this was in fact Mr. Underwood's signature.

As stated, that portion of the complaint charging the petitioner with an unlawful refusal to bargain in violation of § 8(a) (5) of the Act was dismissed by the Trial Examiner, unlike the situation in the Gissel cases cited above. The Board there contended that a bargaining order was an appropriate remedy for a § 8(a) (5) violation where the employer commits other unfair labor practices that tend to undermine the union's support and render a fair election improbable. In Gissel the Court held that the employers' refusals to bargain in each of the cases was accompanied by independent unfair labor practices which tended to preclude the holding of a fair election. These included threats of reprisal and wrongful discharges, which do not exist here.

The Union majority found in this case, in our opinion, rests on a doubtful foundation. We find little evidence that there was in fact a majority which was dissipated by the actions of the petitioner which have been found to be § 8(a) (1) violations. The Trial Examiner found the discharges were for cause. He found no unlawful threats of reprisal prior to the election and apparently considered the allegedly ambiguous general statements after the election only as casting light on the prior statements.

■ It is conceded that the Board has wide discretion in fashioning reme-

dies. NLRB v. Strong, 1969, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546, but the Board's actions are not completely immune to judicial review where the remedy applied in the circumstances is merely oppressive and not calculated to carry out the policies of the Act.

■■ An affirmative bargaining order has been recognized as an appropriate remedy for § 8(a) (1) violations where the employer has engaged in flagrant unfair labor practices so outrageous and pervasive and of such nature that the resultant coercive effect cannot be eliminated by traditional remedies. NLRB v. Flomatic Corp., 2 Cir., 1965, 347 F.2d 74, 77–78. There were no such flagrant violations here.

To the extent that the Order imposes a present duty to bargain, enforcement is denied. In all other respects, to the extent that the order remedies violations of § 8(a) (1) enforcement is granted.

Enforcement of the Board's order granted in part and denied in part.