INTERNATIONAL LADIES' GARMENT
WORKERS' UNION, AFL, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

B.V.D. COMPANY, Inc., Respondent.

Nos. 12511, 12585.

United States Court of Appeals
District of Columbia Circuit.

Argued February 3, 1956.

Decided May 3, 1956.

See also, 96 U.S.App.D.C. 272, 225
F.2d 923.

Mr. Bernard Dunau, Washington, D. C., with whom Mr. Morris P. Glushien, New York City, was on the brief, for petitioner in case No. 12511. Mr. Samuel H. Jaffee, Washington, D. C., also entered an appearance for petitioner in No. 12511.

Mr. Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, for respondent in case No. 12511, and petitioner in case No. 12585. Mr. Robert G. Johnson, Attorney, National Labor Relations Board, also entered an appearance for respondent in case No. 12511 and petitioner in case No. 12585.

Mr. Henry G. Friedlander, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Marshall J. Seidman, Pittsburgh, Pa., was on the brief, for respondent in case No. 12585.

In case No. 12511, Messrs. J. Albert Woll, Arthur J. Goldberg and David E. Feller, Washington, D. C., filed a brief on behalf of AFL-CIO, as amicus curiae, urging that the order of the Board be set aside for failure to order reinstatement of certain employees.

In case No. 12511, Mr. Marshall J. Seidman, Pittsburgh, Pa., filed a brief on behalf of B.V.D. Company, Inc., as amicus curiae, in opposition to the petition for review.

Before EDGERTON, Chief Judge, and PRETTYMAN and BAZELON, Circuit Judges.

BAZELON, Circuit Judge.

The National Labor Relations Board order under review in these two cases stems from the 1952 campaign of the International Ladies' Garment Workers' Union, AFL, to organize women employees at the Pascagoula, Mississippi, plant of the B.V.D. Company. In connection with the campaign and the ensuing strike, 46 of these employees were discharged or denied reinstatement.

In No. 12585, the Board seeks enforcement of its order which, by a unanimous vote, directed the Company to cease and desist from certain unfair labor practices and reinstate seven employees with back pay. In No. 12511, the Union seeks to set aside the Board's refusal, by a 3–2 vote, to adopt the Trial Examiner's recommendations (1) to reinstate with back

pay 37 of the 46 employees who, as the Board found, were discriminatorily discharged or discriminatorily denied reinstatement by the Company; and (2) to find that two additional employees (Shumack and Bullock) were discriminatorily discharged by the Company.[1]

### Case No. 12585

■ The Board's conclusion that the Company committed unfair labor practices was based on two findings: first, that it dismissed, and refused to reinstate, certain employees because of their concerted Union activities;[2] second, that it interfered with the employees' organizational activities by threats of reprisal.[3] These findings may not be disturbed since we conclude, upon consideration of the record as a whole, that they are supported by substantial evidence. This appears too clearly to require elaboration.

### Case No. 12511

The Board withheld reinstatement and back pay relief[4] because of incidents which occurred during the strike involving varying degrees of misconduct. The Board thought such relief would encourage violence and coercion in labor disputes which the Act seeks to prevent.

### I.

The Board found that, on April 21, 1952, a group of employees was discriminatorily discharged. On the next day, they and their fellow employee sympathizers began picketing in front of the plant. The pickets engaged in some name-calling and threats but for the most part their conduct was orderly.[5] Most of the incidents involving misconduct and violence occurred during the

first two and one-half or three days of the strike, before a State court restraining order was issued. None of these early incidents directly involved any of the employees whose rights are in issue.

Three of the incidents stemmed from the pickets' attempts to persuade truck drivers to respect the picket line. In one instance, after a driver approaching the mill to deliver goods misrepresented that his purpose was to pick up United States mail, the pickets took down his license number, and Union organizer Miley temporarily parked her car in such a way as to block the truck. As the truck left the plant, it was followed by five men in a car who asked the driver not to cross the picket line. The men included Wallace, business agent of the Boilermakers' Local, and Sullivan, brother of an ILGWU official. None of the car's occupants were employees, pickets or members of the ILGWU.

In another instance, when pickets surrounded a Railway Express truck as it approached the plant, Nellums, husband of one of the pickets, threatened to "slap the hell out of" the Company's Vice-President who urged the driver to back in. As the driver did so, the picketing strikers shouted, "You can get in today but you won't be able to get in tomorrow." The third incident involved the trailing of a truck, as it emerged from the plant, by a car containing Wallace, Russell (another Boilermakers' representative) and Bullock (husband of one of the discharged employees).

On the second day of picketing, when rumors of violence were current, Wallace told the sheriff that if the mill personnel "think they are going to come out here

---

1. We have jurisdiction under § 10(f) of the National Labor Relations Act, 61 Stat. 148 (1947), 29 U.S.C.A. § 160(f).

2. Sections 8(a) (1) and (3) of the Act, 61 Stat. 140 (1947), 29 U.S.C.A. § 158 (a) (1) and (3).

3. Section 8(a) (1), 29 U.S.C.A. § 158 (a) (1).

4. It appears that most of the strikers were finally reemployed, pursuant to a strike settlement agreement, on August

14, 1952, after the hearing in this case began. The Board did not find that the agreement mooted the reinstatement claim, in view of the fact that its order dealt with that issue as well as back pay. And since both issues are contested here, we shall deal with the Board's order as it appears in the record.

5. The Board also found that the picket signs carrying notations of various license numbers were designed to "intimidate truckers."

and run over us, just a handful of people, we'll get the Seamen out of Mobile and the Shrimpers out of Biloxi * * *." Anticipating that the threat might be carried out, the sheriff called out the National Guard to preserve order. Wallace testified that he intended to "kid" the sheriff, but the sheriff said he took the threat seriously "especially in a time as hot as this one." The Board found that the "threat to bring in seamen and shrimpers, who had the reputation of being tough, was widely circulated and believed."

On the night of the second day of picketing, telephone wires leading into the mill were cut by unidentified persons.

On the third day, April 24, the Chancery Court of Mississippi issued a temporary restraining order against picketing. The order remained in effect for three weeks. No incidents occurred during this period.[6]

A permanent injunction was entered on May 14, enjoining the Union and strikers from, inter alia, "illegal picketing," the use of force or intimidation to prevent others from working, obstructing vehicles from leaving the plant, and acts of violence against the Company or its employees.

Picketing resumed on May 14 and ended on August 14, when the discharged employees returned to work pursuant to a settlement agreement.[7] The Board found that during that period "dynamite was hurled at the plant's electric substation, seriously damaging the plant property." No one was injured. On unspecified dates, Plant Manager Boyle found bullet holes in the windows of the plant.

It was thought these were caused by bullets fired from passing cars at night, though the bullets were never found. The perpetrators of these acts were never identified.

Two strikers, Bush and Renfroe, admitted that, on one occasion in June, they and some sympathizers, standing in front of their headquarters threw eggs at a group of employees waiting at a bus stop across the street. Their action was unprovoked. No one was hit.

The Board found that other miscellaneous acts of misconduct took place. "Nails were thrown on company roadways to impede truck entry into the plant." The nail throwers were not identified. On one occasion, Vice-President Nicholas' car was "jammed to the side of the road by another car driven by strike sympathizers; on another occasion his car was similarly forced into a roadside ditch." One of the occupants of the car in each instance was the husband of an employee discharged in February before the strike began.[8] Nellums, husband of a picketer and a member of the Boilermakers' Union, assaulted one of the Company's supervisors.

## II.

The Examiner's conclusion that reinstatement with back pay should be ordered was based on a finding that all the pickets "affirmatively and credibly denied on the stand any participation in violence and misconduct connected with the strike" with the exception of the egg-throwing incident. In the context of the entire strike, he did not regard this incident as sufficient reason for withholding the usual remedy of reinstatement.[9]

6. The order was entered upon the Company's complaint that Union organizer Miley, certain named strikers and others had conspired together to prevent other employees from working and to use coercion and violence. In an oral opinion, the State court concluded that a conspiracy had been shown and that the "acts of the picketers and those assisting them—their sympathizers—were wrongful in that they showed coercion, intimidation, threats to do violence, and some violence."

7. See note 4, supra.

8. This finding was based solely on the testimony of Vice-President Nicholas whom the Trial Examiner had discredited in several instances.

9. The Examiner refused to attribute the "coercive and intimidating conduct" of the strike sympathizers to the pickets even though he found that the pickets "may have been happy about events as they developed.".

The Board agreed that none of the strikers had participated in the misconduct attending the strike. Nevertheless it granted relief to only six.[10] Relief was denied the rest principally because of their failure to take affirmative action to disassociate themselves from the misconduct, a failure which the Board construed as tantamount to approval or ratification.[11] The crucial finding, in the Board's words, was that

> "strikers have no right to protection when they, at the very least, welcomed the aid of criminal elements who took over their strike and desecrated it with violence and terrorism. We are forced to conclude that those strikers who continued to picket not only approved and ratified the violence but actually invited it. We are compelled to this conclusion because there is no evidence in the record that the strikers took any action at all—by admonishment, denunciation or public pronouncement —to discourage the commission of violence or to disassociate themselves from it. We do not suggest, as the dissent states, that the strikers could have purged themselves only by abandoning their picketing. There were other avenues open to them by which they could have disavowed the misconduct. They chose none of

them. We fail to see that the requirement that strikers keep their strike within legal bounds abridges their right to strike."

Board members Murdock and Peterson dissented. Member Murdock pointed out that denial of reinstatement with back pay, based upon "censurable acts of a few strikers, outsiders and unidentified persons," in which the discharged strikers did not participate, is a departure from the established principle that "misconduct of certain employees is not to be charged to others in the absence of proof identifying the others as participating in such misconduct."

### III.

■ The Board's decision rests upon its assertion of power under § 10(c) of the Act to frame remedial orders, on a case by case basis, which will "effectuate the policies of [the] Act." [12] When violence and misconduct attend a strike, the Board says, wholesale denial of reinstatement and back pay, without regard to individual fault, is peculiarly suited to promoting the "peaceful solution of labor disputes." We agree with petitioner that the Board's action constitutes a reversal of long-standing policy and cannot be sustained upon the basis here adopted by the Board.[13]

---

10. Upon a finding that the six "did not participate in or ratify" the violence, the Board ordered their reinstatement with back pay. Their role in the strike was passive. Four did not picket, but merely refrained from working.

11. The Examiner concluded that no conspiracy to commit violence had been established. The Board held that the issue of conspiracy was irrelevant, but did not specifically reverse the Examiner. However, it found the State court's judgment "of probative value" though not "determinative" in making an independent evaluation of the seriousness of the misconduct.

12. 61 Stat. 147 (1947), 29 U.S.C.A. § 160 (c).

13. The Board views this case as not departing from the "general principle established in earlier cases that unfair la-

bor practice strikers who are themselves innocent of any wrongdoing should not be denied reinstatement or back pay because of the misconduct of others." N.L.R.B. Brief, p. 78. The Sixth Circuit apparently has a different view. It decided in National Labor Relations Board v. Cambria Clay Products Co., 6 Cir., 1954, 215 F.2d 48, 53, that "unauthorized acts of violence on the part of individual strikers are not chargeable to other union members in the absence of proof that identifies them as participating in such violence." But after the Board's decision in the present case, the court granted a motion to remand for a determination of the applicability of "the doctrine of the B.V.D. Company case." Circuit Judge McAllister opposed the remand on the ground that "it is inequitable to deny reemployment to an employee who has not been guilty of violence and un-

■ In a long line of cases, both before and after the 1947 Taft-Hartley amendments of the Wagner Act,[14] courts have without exception adhered to the principle that proof of individual wrongdoing is a prerequisite to disqualification for reinstatement and back pay.[15] The sense of these cases has been reaffirmed recently in National Labor Relations Board v. Marshall Car Wheel & Foundry Co., 5 Cir., 1955, 218 F.2d 409. There the Board had ordered full reinstatement of all discharged economic strikers, without identifying those who engaged in an illegal walkout and those who did not, because it found that the employer had condoned the walkout. On appeal, the court concluded that the Board's finding of condonation was unsupported, and consequently held the issue of individual responsibility to be relevant. Since it was clear that some of the discharged strikers had "either participated in, authorized or ratified the illegal [unprotected] walkout * * *,"[16] the court held that the Board was without authority to compel their reinstatement.[17] Accordingly the case was remanded to the Board with directions to identify the strikers who should be disqualified from relief under this test.

■ We agree that the Board has no authority to *compel* reinstatement of employees who directly or indirectly participate in, authorize or ratify misconduct. We also agree that the Board has no authority to *deny* reinstatement to employees who do not so act. On the remand in Marshall Car Wheel, the Board itself stated that its authority to deny reinstatement extended *"only* to those who authorized or participated in the wrongful conduct and their aiders and abettors." [18]

---

lawful conduct, simply because, when the strike was in progress, he did not take steps to disassociate himself from the unlawful conduct of others." Union Brief, p. 38, note 24.

The Board itself declined to apply the B.V.D. "doctrine" to a later case. In Bowman Transportation, Inc., 36 L.R.R.M. 1021, 112 N.L.R.B. No. 55 (1955), the Board refused to disqualify a picketing employee, absent evidence that he himself had participated in any unprotected activity, even though "much violence and misconduct" occurred during the strike.

14. 61 Stat. 136 (1947), 29 U.S.C.A. § 151 et seq.

15. Pre-amendment decisions: Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 1939, 107 F.2d 472, 479; National Labor Relations Board v. Ohio Calcium Co., 6 Cir., 1943, 133 F.2d 721, 726; National Labor Relations Board v. Mt. Clemens Pottery Co., 6 Cir., 1945, 147 F.2d 262, 268; National Labor Relations Board v. Quality & Service Laundry, Inc., 4 Cir., 1942, 131 F.2d 182, 183, certiorari denied, 1943, 318 U.S. 775, 63 S.Ct. 831, 87 L.Ed. 1144.

Post-amendment decisions: National Labor Relations Board v. Deena Artware, Inc., 6 Cir., 1952, 198 F.2d 645, 652, certiorari denied, 1953, 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 1342; National Labor Relations Board v. Wallick, 3 Cir., 1952, 198 F.2d 477, 485, note 10; National Labor Relations Board v. Crowley's Milk Co., 3 Cir., 1953, 208 F.2d 444, 446.

16. 218 F.2d at page 413.

17. In so doing, the court rejected the precise contentions which the Board would have us accept here in the guise of sustaining its exercise of powers under § 10(c). These were (1) the view of the dissenting Board Chairman that *"all* the striking employees were properly discharged, irrespective of whether they actually engaged in the unlawful walkout * * *" 218 F.2d at page 417; (2) the company's contention that "the issue of misconduct by individual employees is immaterial, and that it properly discharged or denied reinstatement to all strikers, regardless of when they joined the strike and whether their cessation of work actually contributed to the property hazard, presumably on the theory of an agency relationship between all strikers, the guilty employees, and the union." Ibid. The court disposed of the agency argument by citing National Labor Relations Board v. Ohio Calcium Co., 6 Cir., 1943, 133 F.2d 721, 726.

18. 37 L.R.R.M. 1220 (1956). It thereupon ordered reinstatement to employees who, "by merely engaging in the strike [when it constituted protected activity] or picketing .* * * did nothing to approve or ratify the unprotected strike activity

■ The view that, absent an agency relationship, an employee may not be charged with misconduct committed by others is reinforced by § 2(13), added by the Taft-Hartley Act in 1947. It provides that

"In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." [19]

■ This section was enacted to eliminate the strict requirement for proof of authorization and ratification which the Supreme Court read into a somewhat comparable section of the Norris-La-Guardia Act [20] in United Brotherhood of Carpenters and Joiners of America v. United States, 1947, 330 U.S. 395, 67 S. Ct. 775, 91 L.Ed. 973. But the legislative history of § 2(13) makes plain that Congress intended to do no more than to restore the applicability of common law agency principles of responsibility,[21] which preclude imputation of the acts of one person to another except when the one is acting as agent for the other.

■ The Board suggests that § 2(13) is limited to a definition of the responsibility of an employer or labor organization and is inapplicable to individual employees. We think § 2(13) is not so limited. By its terms it covers "any person." While it is true that the legislative history speaks primarily of employers and unions,[22] it would be illogical, and the Act does not require us, to judge their vicarious responsibility for wrongful acts by one standard and that of individual employees by a different standard.

The Board says that the strikers erred when they continued picketing during the "violent strike" and failed to repudiate and denounce violence which was "committed on their behalf." From these two factors, the Board concludes that the strikers "welcomed, approved and ratified" the misconduct and therefore forfeited their right to relief.

■ A conclusion of ratification drawn from mere failure to abandon picketing would curtail an important statutory and constitutional right. Curtailment of this right is justified only when violence has "given to the picketing a coercive effect whereby it would operate destructively as force and intimidation." Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, Inc., 1941, 312 U.S. 287, 298, 61 S.Ct. 552, 557, 85 L.Ed. 836. As the Union points out, the Board made no finding that the picket line itself had "a coercive effect," [23] or that the picketers themselves contributed to the violence.

or to aid or encourage the strikers in their wrongful conduct." Id. at 1221.

19. 61 Stat. 139, 29 U.S.C.A. § 152(13). This section states a "rule to be applied for the purpose of determining when a person is acting as an 'agent' of another person so as to make such other person responsible for his acts." H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. 36 (1947), in 1 Leg.Hist. 540. "Leg.Hist." refers to the two volume edition entitled "Legislative History of the Labor Management Relations Act, 1947," U.S. Government Printing Office 1948.

20. Section 6 which provides that members of a labor union participating in a labor dispute are not responsible "for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in or actual au-

thorization of, such acts, or of ratification of such acts after actual knowledge therof." 47 Stat. 71 (1932), 29 U.S.C.A. § 106.

21. H.R.Rep. No. 245, 80th Cong., 1st Sess. 11 (1947), in 1 Leg.Hist. 302; H.R. Conf.Rep. No. 510, 80th Cong., 1st Sess. 36, in 1 Leg.Hist. 540; 93 Cong.Rec. 6442, 6534, 6859, 7001 (1947). See also United Mine Workers of America v. Patton, 4 Cir., 1954, 211 F.2d 742, 748.

22. E. g., "Both employers and labor organizations will be responsible for the acts of their agents in accordance with the common law rules of agency (and only ordinary evidence will be required to establish the agent's authority)." H.R.Conf.Rep. No. 510, supra note 21.

23. The plant continued in operation throughout the strike, and there is no

■ Nor can a conclusion of "ratification" rest on the strikers' failure to disassociate themselves from misconduct by "admonishment, denunciation, or public pronouncement." Aside from the question whether these terms suggest a meaningful course of conduct that the strikers may have elected, we think they were under no obligation to disavow misconduct which they did not initiate and with which they are not shown to have been connected, directly or indirectly. United Mine Workers of America v. Coronado Coal Co., 1922, 259 U.S. 344, 395, 42 S.Ct. 570, 66 L.Ed. 975. And their silence provides no rational basis for inferring that they acquiesced in the wrongs of others with whom no agency relationship is shown. United Electrical Workers v. National Labor Relations Board, 1955, 96 U.S.App.D.C. 46, 51, 223 F.2d 338, 343, makes clear that such a relationship is an essential prerequisite to the inference which the Board seeks to draw from the strikers' silence.

■ The Board's decision rests on the simple findings that there was picketing and there was violence. No connection between the two was shown. We think that basis not sustainable. For that reason the order must be set aside in part and the case remanded for reconsideration. We will not attempt to prescribe proper criteria. Such prescription, involving many factors, is for the Board's initial determination. Securities & Exchange Comm. v. Chenery Corp., 1943, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626; Id., 1947, 332 U.S. 194, 196, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995; Sales Drivers, etc., v. National Labor Relations Board, 97 U.S.App.D.C. 173, 229 F.2d 514 (1955).

### IV.

■ The Board reversed the Trial Examiner's finding that two employees were dismissed because of the part they played in the "first home union meeting

* * * on February 18, 1952." The record as a whole would, we think, support the inference that there was a discriminatory motive in their discharges. But in view of the inconclusive nature of the evidence showing respondent's knowledge of the dischargees' union activities, we cannot say that the Board was unjustified in drawing a contrary inference. National Labor Relations Board v. Shen-Valley Meat Packers, 4 Cir., 1954, 211 F.2d 289, 292. The Board's order in this respect is affirmed.

Affirmed in part, and set aside in part and remanded.

---

evidence that any employee who wished to work was prevented from crossing the picket line. Indeed, on May 14, 1952, three months before the strike ended, the State court granted the strikers permission to resume picketing, suggesting that,

even if the picket line had been enmeshed in violence for the first three days, its coercive character had been dissipated, and did not reappear for the remainder of the strike.