**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SEA–LAND SERVICE, INC., et al., Respondents.**

No. 6442.

United States Court of Appeals First Circuit.

Heard Sept. 13, 1965.

Decided March 2, 1966.

Morton Namrow, Atty., Washington, D. C., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., N. L. R. B., Washington, D. C., were on brief, for petitioner.

Herbert Burstein, New York City, with whom Zelby & Burstein, New York City, was on brief, for respondents.

Before ALDRICH, Chief Judge, J. WARREN MADDEN, Senior Judge,* and JULIAN, District Judge.

JULIAN, District Judge.

This case is before the Court on petition of the National Labor Relations Board for the enforcement of its order against Sea-Land Service, Inc., and Sea-Land of Puerto Rico, a division of Sea-Land Service, Inc., herein referred to collectively as respondent or as Sea-Land.[1]

This Court has jurisdiction under Section 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C. §§ 151 et seq.). The Board's jurisdiction is not contested.

The Board found that the respondent violated Section 8(a) (1), (2), (3), and (5) of the Act [2] and entered its order accordingly. The respondent attacks the validity of the order on the general ground that there is no probative evidence of record to support the Board's findings, and on other specific grounds which will be dealt with later.

The following is a summary of the evidence upon which the Board's findings are based:

In 1960, Sea-Land, a corporation controlled by McLean Industries, Inc., began operating a service to Puerto Rico with ships known as C-2's which transport truck trailers containing cargo. Since the inception of this service Sea-Land has had collective bargaining relationships with the International Longshoremen's Association (ILA), its District Council in Puerto Rico, and ILA Locals 1575 and 1855 at San Juan and Ponce, respectively, covering stevedoring and other employees working at its terminals in those ports. In addition to installations at Ponce and San Juan, Sea-Land maintains terminal facilities at various ports in continental United States where it has collective-bargaining relationships with the ILA and its various subdivisions.

Prior to the events herein, a Sea-Land C-2 carrying cargo from Newark, New Jersey, to Puerto Rico customarily stopped each week at San Juan to unload

---

* Sitting by designation.

1. The Board's decision and order are reported in 146 N.L.R.B. No. 107.

2. Section 8(a) (1), (2), (3), and (5) of the National Labor Relations Act (29 U.S.C. § 158) read as follows:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it * * *;

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *;

* * * * *

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

Section 7 of the Act (29 U.S.C. § 157):

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

trailer vans for the San Juan area. It then proceeded to Sea-Land's Ponce dock where the trailer vans of Ponce cargo were unloaded by Sea-Land's Ponce employees who were members of ILA Local 1855. Occasionally, because of weather conditions or economic reasons, the Ponce stop was omitted, and the weekly C-2 returned directly to Newark after calling at San Juan. In September, 1960, Sea-Land established the practice of sending a 25-man gang of its Ponce stevedores to San Juan to unload the trailer vans destined for the Ponce area whenever a C-2 was rescheduled to return directly to Newark without making its usual stop at Ponce. On the following day, Sea-Land would employ another 25-man gang at its warehouse in Ponce to strip the trailer vans which had been hauled over the road from San Juan. In 1961, Ponce stevedore gangs were sent to San Juan on seven occasions.

On September 11, 1961, ILA leaders met in San Juan with officers of its newly acquired Union de Trabajadores de Juelles (UTM) locals and those ILA locals which had remained ILA affiliates during ILA's tenure as an independent union and while it had been on probationary status before rejoining the AFL-CIO. Formerly, the UTM locals in Puerto Rico had been constituent locals of the International Brotherhood of Longshoremen (IBL), but they withdrew from the IBL and affiliated with the ILA when the latter regained its full status as an international union in September, 1961. The purpose of the meeting was to persuade the original ILA locals in all of the Puerto Rico ports, except San Juan, to accept a plan whereby the ILA locals at each port would merge with their UTM counterparts into single ILA locals to be managed by the respective officials of the former UTM locals. In the port of San Juan, ILA Local 1575 and UTM-ILA Local 1740 were to continue to function separately until a secret ballot election could be held among the members of ILA Local 1575 to decide upon the merger. At Ponce, ILA Local 1855, with about 100 members, was to merge with UTM-ILA Local 1903, with a membership of 1,200, into a single local to be administered by Pedro Rosas, the UTM local's president. At this meeting, Ramon Mejias, the president of ILA Local 1855, insisted that he could not sign the merger agreement without authorization from his local.

Subsequently, the members of Local 1855 met, rejected the merger, voted to disaffiliate from the ILA, and to form Insular Labor Organization (ILO), an independent labor organization. On September 14, 1961, ILO petitioned the Board for certification as the collective-bargaining representative of a unit of Sea-Land's stevedores and related employees at Ponce, and ILA and its Puerto Rico district council were permitted to intervene in the proceeding. On June 8, 1962, the Board directed that an election be held among Sea-Land's employees in the unit proposed by ILO. Thereafter, a Board election was set for July 2, 1962, with ILO and the ILA unions appearing on the ballot.

On June 22, 1962, Sea-Land's stevedore supervisor, Joe Braseau, told Ponce stevedore employees Virgilio Echevarra, Efrain Jiminez, and Celestino Perez that if ILO won the impending Board election, no Sea-Land ships would come to Ponce and Ponce stevedore gangs would no longer be sent to San Juan to handle Ponce cargo. ILO president Ramon Mejias immediately brought Braseau's warning to the attention of Luis Montero, Sea-Land's terminal manager at Ponce, but no action was taken by Sea-Land to disclaim any influence ILA might exert upon Sea-Land's operations if ILO won the Board election.

In a letter dated June 26, 1962, Ramon Mejias complained to Montero about reports that the next C-2, expected to arrive in Ponce on June 29, would not make its scheduled Ponce stop and that this circumstance would be detrimental to the ILO's interests and serve to strengthen ILA's cause in the forthcoming Board election. Montero replied on June 27 that Sea-Land, in fact, had rescheduled the next C-2 to by-pass Ponce.

On June 28, 1962, before the customary 25-man gang from Ponce had arrived in San Juan, Eusebio Moreno, ILA vice president for Puerto Rico, and Guillermo Ortiz, president of ILA Local 1575, told Frank Bailey, Sea-Land's manager and chief executive official in Puerto Rico, that Sea-Land's gang of Ponce employees would be thrown into the river if they appeared in San Juan to unload the re-scheduled C-2. Captain Bradley, however, the then president of ILA, who was also present, promptly interceded to countermand Moreno's and Ortiz's statement, and the ILA officials advised Bailey that they would "allow [the Ponce gang] to come."

On the same day, Captain Bradley approached Ramon Mejias, who had been sent to San Juan with Sea-Land's customary Ponce gang, and demanded that ILO's president withdraw ILO's representation petition and reaffiliate with the ILA, but Mejias refused to do so.

Two days before the election, Captain Bradley appeared in Ponce and told the ILO membership that they would lose the stevedoring work at Ponce if they insisted upon maintaining their independent organization by voting for ILO in the Board election.

ILO won the Board election on July 2, 1962, receiving 77 votes to 3 votes for the ILA unions, and was certified by the Board as the collective-bargaining representative of Sea-Land's employees at Ponce on July 11, 1962.

Since the Board election, no C-2 ships of Sea-Land have called at Ponce, although Sea-Land continued to advertise the stop on its schedule and in announcements to customers and the general public.

In addition, Sea-Land discontinued its established practice of sending Ponce stevedores to San Juan to unload the C-2 trailer vans destined for overland delivery to Ponce, and such cargo has been unloaded only by employees represented by ILA unions in San Juan. The officers of ILO repeatedly advised Sea-Land representatives that ILO members were willing to go to San Juan to do this work, but they were told by Sea-Land's terminal manager at Ponce, Montero, that he had orders from Manager Bailey that no more ILO gangs were to be sent to San Juan.

After the Board election, Sea-Land also reduced the size of the warehouse gang, which strips the trailer vans that arrived from San Juan, to 8 to 10 employees, instead of using the customary gang of 25 employees.

In August or early September, 1962, another variety of trailership known as a C-4, which also has some space for conventional cargo, began to arrive weekly at Ponce carrying Sea-Land's cargo formerly transported by Sea-Land's C-2's. Sea-Land leased the C-4's from a sister corporation, Waterman Steamship Corporation and Waterman Steamship Corporation of Puerto Rico (Waterman), pursuant to "bare-boat" charters, whereby Sea-Land has exclusive control over their use, personnel and all other aspects of the C-4's operations, including loading and unloading. However, these ships have arrived at Waterman's facilities in Ponce where the unloading and loading work has been assigned to Waterman's employees who are members of UTM-ILA Local 1903.[3]

About the middle of July, 1962, shortly following its certification by the Board, ILO submitted a proposed stipulation to Sea-Land which provided, among other things, for recognition of ILO, a union shop, and a dues checkoff. The stipulation was to remain in effect until a complete bargaining agreement could be signed.

Meanwhile, Montero, Sea-Land's terminal manager at Ponce, had put off the ILO president's requests for a meeting

---

3. When Waterman, a wholly owned Mc-Lean corporation, failed to institute a trailership service to Puerto Rico in 1958 because of opposition from UTM–IBL unions, McLean arranged to have Pan-Atlantic, Sea-Land's predecessor, handle the mechanized service.

on July 10 with the statement that he would speak to his superiors in San Juan, but ILO heard nothing further. Subsequently, after additional demands for the meeting, Montero told Mejias that he had no instructions to meet with ILO.

On July 15, 1962, three days after Montero had received a copy of the Board's certification of ILO, Montero told Mejias that Ponce gangs of stevedores would no longer be sent to San Juan. At the same time, Sea-Land removed the tractors which it used at its Ponce terminal to haul trailer vans and sent them to San Juan.

On the morning of July 19, 1962, Mejias complained to Montero, as he had done continually in the past, about the failure to send Sea-Land's C-2 ships to Ponce, Sea-Land's failure to send ILO gangs to Ponce, the reduction in the size of its warehouse gangs, and now the removal of Sea-Land's tractors to San Juan. Montero replied again that he knew nothing about these matters since his instructions came from San Juan.

Later the same morning, upon receiving a letter from Sea-Land rejecting ILO's proposed stipulation, the ILO president assembled ILO's members. In the ensuing discussion, the membership declared their dissatisfaction with all of Sea-Land's recent operational changes which had deprived them of work, and voiced their vexation at Sea-Land's rejection of ILO's proposed stipulation and its requests for negotiations. It was decided that ILO would demand that Sea-Land reestablish the normal state of affairs, and sit down to negotiate.

On the afternoon of July 19, 1962, ILO began to picket Sea-Land's facilities at Ponce. The pickets carried signs demanding, inter alia, that "ships come to Ponce," that Ponce "gangs be sent to San Juan," and that Sea-Land "sit down and negotiate." On the following day ILO was persuaded to terminate the picketing by public officials at Ponce who informed ILO that Sea-Land, in a meeting with them that day, had promised to have Manager Bailey meet with

the ILO president in San Juan on July 21 and had assured the public officials that any changes in Sea-Land's Ponce operations were only of a temporary nature.

Although ILO's president, Ramon Mejias, appeared in San Juan on July 21 for the anticipated meeting with Sea-Land, Manager Bailey refused to meet with him until ILO submitted a complete contract proposal. Accordingly, on July 24, 1962, ILO sent Sea-Land a complete contract.

Two days later, Montero advised the ILO president that, in accordance with Bailey's instructions, he was discharged from his position of checking cargo vans hauled over the road from San Juan. On July 30, 1962, David Mejias, a son of ILO's president and himself an ILO officer, was notified by letter that Sea-Land was relieving him from his "position of Chief Clerk."

Whereupon, a special ILO meeting was convened, and the members were advised of Sea-Land's latest actions. During the meeting, the ILO president reiterated ILO's grievances concerning Sea-Land's operational changes, reminding the membership that Sea-Land had made no effort to restore their work. He also pointed out that Sea-Land had reneged on its promise to meet with ILO on July 21 and had failed even to acknowledge ILO's contract proposal submitted to Sea-Land on July 24. It was decided that Ramon and David Mejias would ask Sea-Land again to recognize ILO, to insist that Sea-Land acknowledge ILO's contract proposal and to clarify the notice given David.

When the two ILO officers discovered that Montero was not available to negotiate and were told by the Sea-Land official next in charge at Ponce that he had no authority to hear ILO's grievances, ILO began to picket Sea-Land once again. In addition to signs demanding the reinstatement of David Mejias, the ILO pickets carried signs bearing the same legends as those used during the two-day strike earlier in July.

After the picketing had begun on July 30, 1962, Sea-Land officials called the ILO president from San Juan and asked him what had provoked the strike. Mejias proceeded to enumerate ILO's grievances to J. R. Prado, Sea-Land's second highest offical in Puerto Rico. He then asked Prado to withdraw the letter to his son, and Prado replied that the letter "was an internal affair of the company." He also cautioned Mejias that ILO "was a small new union."

On the following morning, David Mejias was given a second letter by Sea-Land, explaining that he had not been discharged, but merely demoted. Later that morning, ILO informed Sea-Land's Ponce terminal manager that it would continue to picket until David was restored to his previous position and Sea-Land agreed to negotiate the other ILO grievances.

On the afternoon of July 31, 1962, pursuant to instructions from Bailey, Montero called on the UTM-ILA Local in Ponce to furnish men for Ponce warehouse jobs formerly performed by ILO members, and Sea-Land has continued to obtain its warehouse personnel from this source, with the exception of a few ILO members who applied for work in person to Montero.[4] Also, on July 31, 1962, Sea-Land discharged its ILO gatemen and replaced them with an independent guard service.

On August 1, 1962, Ramon Mejias was given a letter from Manager Bailey stating that ILO's July 24 contract proposal was being translated into English as it had to be sent to "our Labor Relations officials in Newark." Bailey went on to say that "[a]s soon as a study of this contract has been finished" ILO would be notified with regard to further negotiations.

On August 1 or 2, 1962, the ILO membership authorized its president to petition Local 901, International Brotherhood of Teamsters, Chauffeurs and Warehousemen, Independent (Teamsters) to accept members of ILO into that local and to bargain on its behalf so long as such action did not jeopardize the certification which the Board had issued to ILO. The Teamsters agreed to ILO's request; and when it apprised Sea-Land of this development on August 2, 1962, Manager Bailey told the Teamsters that if ILO wished the Teamsters to bargain for it, there would have to be an amendment to the Board certification issued to ILO. On August 28, 1962, the Teamsters informed ILO and Sea-Land that it had abandoned its effort to bargain on behalf of ILO.

In the meantime, on August 24, 1962, Sea-Land refused a request of ILO for a bargaining meeting. However, after the Teamsters had withdrawn from the scene, ILO and Sea-Land representatives met on August 30, 1962. At this meeting, Sea-Land rejected ILO's July 24 contract proposal, claiming that the working conditions described therein were in general terms and did not specifically relate to Sea-Land's three types of work: warehouse, trailership, and conventional cargo. Sea-Land agreed to submit a contract proposal. During the meeting, the ILO president asked that the strikers be reinstated while negotiations proceeded.

On September 8, 1962, the ILO president wrote to Manager Bailey, reminding him of Sea-Land's August 30 commitment to present a counterproposal. He also requested that Sea-Land's representatives meet with him on September 10. On September 11, 1962, Mejias sent Sea-Land a telegram, insisting that Sea-Land resume negotiations.

4. One such ILO member, Rivera, testified as follows before the trial examiner:
"Q. * * * Have you worked, Mr. Rivera, in the Sea-Land warehouse since the strike of July 30 and 31?
"A. Yes.
"Q. How did you obtain the work?
"A. Through Montero.
"Q. How, though?

"A. Well, one of my children was sick in the hospital and he asked me if that was true and I said yes, I needed some money for a blood transfusion for the child. Then I asked him if I had a chance, if there was a chance for me, and he said yes, there was a chance, but I wasn't to come in to work as an ILO. * * *"

On September 17, 1962, ILO forwarded to Sea-Land a revised contract in English, containing provisions applying to warehouse work, trailership, and conventional cargo operations. Two days later, Sea-Land informed ILO that it was studying the revised contract and would "notify [ILO] when this is completed."

On September 21, 1962, Sea-Land representatives failed to appear for a bargaining meeting between the parties which had been arranged by the Puerto Rico Department of Labor at its offices in San Juan.

On October 4, 1962, ILO advised Sea-Land by letter that all of its members were "ready and willing to return to their former jobs without imposing any conditions of any kind." Sea-Land replied on October 9, 1962, that the ILO strikers had been replaced by the "employment of other labor" and that it was "not in a position at the present time to remove these men."

A day earlier, ILO's attorney also informed Sea-Land by letter that ILO members were "ready, willing and able to come to San Juan or any other place designated by you to handle the loading and unloading of Ponce cargo in the same manner as was previously done." On October 11, Sea-Land answered that its "[c]argo destined to Ponce has been turned over to Waterman of Puerto Rico and is moving to the port of Ponce on the C-4 vessels [which] eliminates * * * our responsibility for the handling of this Ponce cargo."

The parties met on three subsequent occasions before the Board hearing, but no final agreement was reached.

The Board's ultimate findings of fact were these:

The warning of a supervisor of respondent on June 22, 1962, that respondent's Ponce employees would lose their jobs if they voted for ILO to be their collective-bargaining representative in the July 2 election, and respondent's indifference and stalling with respect to requests of the ILO to meet to discuss grievances and bargain after the Ponce employees had selected ILO as collective-bargaining representative and the Board had so certified, has interfered with, coerced and restrained the stevedores and related employees of the respondent at its Ponce terminal in the exercise of their right to join the ILO and to choose it as their collective-bargaining representative.

Before and after the election of July 2, 1962, the respondent knew of the competitive situation existing between ILO and ILA. Respondent's stevedores and related employees at its terminals in San Juan and at ports in continental United States, with the exception of the West Coast, are represented by ILA unions. The respondent by its conduct has contributed support to ILA unions in their efforts to bring about the absorption by UTM Local 1903 of the ILO members it employs at Ponce and to supplant ILO as the bargaining representative of these employees. An object of the respondent's conduct has been and is to support ILA unions in their contest with ILO. There is no evidence that a compelling economic reason rather than a discriminatory one caused respondent to make the operational changes it made about June 29 and July 5, and to assign in August or early September, 1962, the handling of the trailer van cargo as well as the conventional cargo of the C-4's at Ponce to Waterman with its UTM Local 1903 member employees rather than handle it directly with its employee members of ILO. Respondent's contention that it could not handle directly, with its employee members of ILO, the lesser tonnage of conventional cargo carried by the C-4's, an assignment basic to any cargo handling, and the type of work done by ILO members before they began handling the trailer vans in 1958, is a specious contention. In fact, respondent has asked ILO since the latter's selection as bargaining representative to include in its contract proposals a provision covering the work of handling conventional cargo. ILO is certified to represent all of respondent's employees loading and unloading its cargo at Ponce. Respond-

ent's employees who are members of ILO at Ponce have been discriminatorily denied the work of handling the cargo of the C-4's, the substituted service for the C-2's, and the cargo of the C-2's that respondent may bring to Ponce.

Before and after the election, respondent discriminatorily denied employment to its approximately 100 stevedores and related employees at Ponce, who are listed in Appendix A to the Board's order, to discourage membership in ILO and acceptance of it as collective-bargaining representative and to encourage membership in UTM Local 1903 and the selection of ILA, ILA District Council, and UTM Local 1903 as collective-bargaining representative. This conduct included the discontinuance from about July 5, 1962, of the practice of sending gangs of Ponce employees to San Juan to handle the cargo of its C-2's scheduled to dock at Ponce but rescheduled to return to Newark directly from San Juan; the discontinuance of bringing its C-2 ships to Ponce from about June 29, 1962, until a date in August or early September, 1962, when it substituted its C-4 ship service to Ponce for the C-2 service; its failure from about July 5, 1962, to employ full gangs of employee members of ILO for warehouse work; and its failure to assign to its employees who are members of the ILO the work of handling the cargo of the C-4 ships at Ponce since the time these ships first docked at Ponce in August or early September, 1962, and the employment of members of UTM Local 1903 to do this work through the fiction of engaging Waterman, its sister subsidiary of McLean Industries, to handle it. Waterman's stevedores are members of UTM Local 1903.

Montero, upon instructions from Bailey, discharged Mejias, president of ILO, from his job as hatch tender checking vans hauled overland by independent truckers. The discharge occurred five days following Bailey's failure to meet and bargain with Mejias as he had promised to do the previous day. Respondent refused to reinstate the warehouse workers who engaged in the strike of July 30, 1962, after they made an unconditional offer to return to work on October 4, 1962. That strike was an unfair labor practice strike. ILO member employees of respondent did not strike against jobs of loading and unloading C-2 cargo at Ponce and San Juan or C-4 cargo at Ponce, and therefore have not been required to offer to return to these jobs. Respondent has discriminatorily deprived them of this work since the beginning of July, 1962, a month before the strike. An object of the July 30 strike by the warehouse workers and the protest picketing by the remainder of the ILO member employees of respondent was to persuade respondent to return its ILO member employees to the loading and unloading work at San Juan and Ponce. The strike and protest of July 30 was directed against grievances including respondent's failure to meet and negotiate with ILO.

Respondent failed to negotiate with ILO the discontinuance of sending gangs of its ILO employees to San Juan on and after July 5, 1962, and the discontinuance of bringing its C-2 cargo ships to Ponce on and after June 29, 1962; the employing of less than full gangs in warehouse work at Ponce since about July 5, 1962; and the assignment of the work of handling the C-4 cargo at Ponce since August or early September, 1962. These changes in respondent's operations affected employees' wages, hours, and working conditions, and should have been discussed with ILO which was the certified collective-bargaining representative of all the respondent's employees loading and unloading the cargo of its ships in the port of Ponce.

On the basis of the foregoing findings of fact and the entire record, the Board reached the following conclusions of law:

1) Respondent interfered with, and coerced and restrained employees in violation of Section 8(a) (1) of the Act.

2) Respondent contributed support to ILA, ILA District Council, and UTM Local 1903 in violation of Section 8(a) (2) and (1).

3) Respondent violated Section 8(a) (3) and (1) by discriminating against employees with respect to their hire and tenure of employment, and by refusing to reinstate unfair labor practice strikers after they made an unconditional offer to return to work, to discourage membership in and representation by ILO, and encourage membership in UTM Local 1903 and representation by ILA, ILA District Council, and UTM Local 1903.

4) Respondent in violation of Section 8(a) (5) and (1) refused to negotiate with ILO, the Board-certified collective-bargaining representative of its stevedore and related employees at Ponce, the discontinuance of certain operations on June 29, 1962, July 5, 1962, or thereabouts, and the placing in effect in August or early September, 1962, of a new cargo service to Ponce, all of which affected the wages, hours, working conditions, and other conditions of employment, of the employees represented by ILO.

The order issued by the Board in substance requires the respondent to cease and desist from a) interfering with the right of its employees to become members of the ILO and to select that union as their collective-bargaining representative; b) contributing support to ILA and ILA District Council, and to UTM Local 1903 which is affiliated with ILA; c) discouraging membership in ILO and encouraging membership in UTM Local 1903 by means of discriminatory employment practices against ILO members and in favor of members of UTM Local 1903; and d) refusing to bargain in good faith with ILO as the certified exclusive representative of its stevedore and related employees at Ponce in regard to changes in operations that affect wages, hours, and working conditions of these employees.

Affirmatively, the order in substance requires the respondent a) to offer to the employees listed in Appendix A of the order, immediate and full reinstatement to their former or substantially equivalent employment and to make each of them whole for any loss of earnings suffered by reason of the discrimination against them, and b) to bargain collectively in good faith with ILO as the certified exclusive representative of employees at Ponce in regard to wages, hours, working conditions, and other bargainable matters, including changes in operations or services at Ponce affecting wages, hours, working conditions, or other conditions of employment.

■ The standard for judicial review is set down in Section 10(e) of the National Labor Relations Act (29 U.S.C. § 160(e)) which provides that the "findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." This was construed in Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, to require affirmance of the findings of the Board if, taking the record as a whole, they are supported by substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." The following statement of the Supreme Court is also pertinent:

"It has now long been settled that findings of the Board, as with those of administrative agencies, are conclusive upon reviewing courts when supported by evidence, that the weighing of conflicting evidence is for the Board and not for the courts, that the inferences from the evidence are to be drawn by the Board and not by courts, save only as questions of law are raised and that upon such questions of law, the experienced judgment of the Board is entitled to great weight." Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 681, fn. 1, 64 S.Ct. 830, 832, 88 L.Ed. 1007 (1943).

■ The Court has also stated that "the possibility of drawing either of two inconsistent inferences from the evidence did not prevent the Board from drawing

one of them." N. L. R. B. v. Nevada Consol. Copper Corp., 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305 (1942).

■ The respondent's contention that the order is invalid on the general ground that there is no probative evidence of record that respondent violated Section 8(a) (1), (2), (3), and (5) of the Act is not well founded. Upon a careful reading and consideration of the entire record, and applying the required standard of review, the Court is satisfied that the findings and conclusions of the Board that respondent violated Section 8(a) (1), (2), (3), and (5) of the Act are supported by substantial evidence on the record considered as a whole.

Respondent claims that pre-election interference and coercion cannot be attributed to the respondent.

On the evidence, the Board was justified in finding that Braseau was a supervisor within the meaning of the Act, and that the threat made by him was attributable to respondent. The record discloses:

1) That Joe Braseau was a "stevedore supervisor." [5] (Bailey, chief executive offical of the company in Puerto Rico, so testified.)

2) That he was the *direct superior* of Perez, who was foreman in charge of a gang of 21 employees working on the hatches.

3) That Joe Braseau made the threat that no more ships would come to Ponce if the men voted for the ILO. The threat was made to his subordinate, Perez, in the presence of other employees.

4) That the threat was reported by Ramon Mejias to Montero, and that no action was taken to clarify company policy or disavow the threat.

This evidence, combined with the fact that the threat was, in effect, carried out—after selection of the ILO no C-2's

were allowed to land at Ponce—is sufficient support for the Board finding of pre-election interference and coercion on the part of the company. In the case of N. L. R. B. v. Falls City Creamery Co., 1953, 8 Cir., 207 F.2d 820, the Board found coercive a statement by a foreman to an employee to the effect that if she were to tell anyone that she had joined the union she would probably be fired. The Court made it clear that

"It is essential to the spirit and intent of the [National Labor Relations] Act that management itself should not only refrain from any conduct which would be directly conducive to restraint of its employees in the free exercise of their rights under the Act, but also that no supervisory officers or employees of the management, whose duties, responsibility, and relationship to management are such that employees may reasonably assume their conduct and statements originate from and express the views of management, should bring about such coercion or restraint by their conduct." Id., at 829.

In the case of N. L. R. B. v. Franks Bros., 1943, 1 Cir., 137 F.2d 989, an employer was held liable for statements of "supervisory personnel" in spite of express instructions by the employer that the supervisors refrain from interfering with the employees in their union activities. The basis of liability is that the employer may gain from the supervisor's statements an "advantage in the bargaining process of a kind which the Act proscribes." Id., at 992. The rule was specifically laid down by the Supreme Court in H. J. Heinz Co. v. N. L. R. B., 1941, 311 U.S. 514, 521, 61 S.Ct. 320, 323, 85 L.Ed. 309. The Court held that the Board could take action against the employer

"where petitioner [employer], when advised of the participation of his

5. There was evidence that Braseau was in charge of the loading and unloading of respondent's ships in the absence of the chief assistant to respondent's chief of the marine division on the island, also referred to in the evidence as respondent's district marine manager in the supervision and operation of the loading and unloading of vessels.

supervising employees in the organization campaign, took no step, so far as appears, to notify the employees that those activities were unauthorized, or to correct the impression of the employees that support of the Union was not favored by petitioner and would result in reprisals. From that time on the Board could have found that petitioner was as responsible for the effect of the activities of its foremen and group leaders upon the organization of the Association as if it had directed them in advance."

Respondent argues that the strike of July 30 was not an unfair labor practice strike and therefore was not a protected activity. However, applying the required standard of review, the Board's findings of unfair labor practices on the part of the respondent are adequately supported by substantial evidence. The bases for such findings included the following:

a) Warning to stevedores on July 22, 1962, that they would lose jobs if they selected ILO.

b) Indifference and stalling with respect to requests for bargaining meetings.

c) Support to ILA by discontinuing C-2 sailings to Ponce, changing work assigning practices, diverting work to ILA.

d) Unilateral change of operating procedures without negotiation with ILO.

e) Discrimination in depriving ILO members of work.

Furthermore, despite some evidence to the contrary, there is ample evidence in the record to support the Board's finding that the purpose behind the strike was to redress these unfair labor practices as well as the demotion of David Mejias. For example:

1. Montero testified that Ramon Mejias advised him after a union meeting on July 31 that "the membership of the union had unanimously accorded not to work until David's position title and job be given back to him *and until the company agreed to sit down to negotiate with Moncho.*" (Emphasis added.) "Moncho" refers to Ramon Mejias.

2. An affidavit of Ramon Mejias states that "Because of this [discharge of David] and because we had not heard from the company concerning our proposed contract the men went on strike."

3. Ramon Mejias also testified to a conversation with Prado and Montero the day after the July 30 strike began. Prado asked "what was the matter now." Ramon Mejias told him "that the company were not selecting gangs and not sending ships to Ponce—they had reduced the number of men we had picked —that we had no answer to the contract that we had sent them—more or less the same things were spoke of in the meeting." The "meeting" was a meeting of the union on July 30 at which the decision to picket was made. Ramon Mejias testified that the major grievances of not sending work gangs to San Juan, etc., were particularly discussed at that meeting. The news of the discharge of David was apparently the final straw.

4. Nunez, a member of the union, called to testify by respondent, testified that the *picket signs* said, "We demand that they negotiate with us"—"We ask for justice"—"We want peace and harmony."

5. Additional testimony by David Mejias indicates that picket legends read, "We ask that ships come to the Port of Ponce"—"We demand that complete gangs be taken"—"We ask that the union be recognized."

There is, therefore, ample evidence in the record to support the Board's conclusion that the strike was in protest of unfair labor practices *as well as* the discharge or demotion of David Mejias.

■■ It is well established that "a strike may be an unfair labor practice strike even though it also has economic objectives." N. L. R. B. v. Fitzgerald Mills Corp., 1963, 2 Cir., 313 F.2d 260, 269; N. L. R. B. v. Stilley Plywood Co.,

1952, 4 Cir., 199 F.2d 319, cert. den., 344 U.S. 933, 73 S.Ct. 504, 97 L.Ed. 718; N. L. R. B. v. A. Sartorius & Co., 1944, 2 Cir., 140 F.2d 203, 206. Unfair labor practice strikers "are entitled to reinstatement with back pay even though there were also other causes of the strike." N. L. R. B. v. Fitzgerald Mills Corp., supra, 313 F.2d at 269. The second circuit held in 1963 that "Since there was substantial evidence to support the Board's finding that refusal to bargain in good faith was at least one cause of the strike, the portion of the order requiring reinstatement and back pay must be enforced." Id., at 269; N. L. R. B. v. Remington Rand, Inc., 1938, 2 Cir., 94 F.2d 862.

Respondent further contends that the violence during the July 30 strike removed the protected status of the strike. The following is a sufficient refutation of that contention.

Acts of violence occurred on July 31 and August 1, 1962, in connection with respondent's efforts to move two refrigerated trailers from its Ponce terminal to a refrigeration plant a short distance away. The evidence establishes the identity of only two persons who participated in the violence. There is no evidence that either ILO or its members generally authorized, ratified, or otherwise participated in the violence. The Board therefore finds that the violence is not conduct that is attributable to the ILO union or to its members generally. The Board denies reinstatement and back pay from the date of the illegal conduct to the two who participated in the violence.

The case of International L. G. W. U. v. N. L. R. B., 1956, 99 U.S.App.D.C. 64, 237 F.2d 545, involved reinstatement of workers after a strike also involving individual instances of violence. The Court stated that

"In a long line of cases, both before and after the 1947 Taft-Hartley amendments of the Wagner Act, courts have without exception adhered to the principle that proof of individual wrongdoing is a prereq-

uisite to disqualification for reinstatement and back pay." Id., at 550.

The Court went on to state:

"And their [other employees'] silence provides no rational basis for inferring that they acquiesced in the wrongs of others with whom no agency relationship is shown." Id., at 552.

See also N. L. R. B. v. Wichita Television Corp., 1960, 10 Cir., 277 F.2d 579, 585, cert. den., 364 U.S. 871, 81 S.Ct. 113, 5 L.Ed.2d 93.

■ An act of violence by a participant in a strike may not be imputed to others generally or to the union in the absence of a showing of agency, ratification, counselling, incitement, or other form of participation in the act of violence by the others or by the union. This rule is a necessary safeguard to the union and its members since in the emotional tensions, and sometimes confusion, generated by a strike accompanied by picketing, it would be a simple matter for outsiders to be injected into the scene to incite one or more strikers to acts of violence for the purpose of destroying the protected status of the strike.

Respondent contends that ILO abandoned its status as the certified union.

The Board has found as follows:

On August 1 or 2, 1962, the ILO members authorized the president, Ramon Mejias, to petition Teamsters Local 901 to accept the members of ILO into that local and to bargain on its behalf if such action did not jeopardize the certification the Board had issued to ILO. On August 2 Mejias made the petition to Chavez, organizer and secretary-treasurer of Teamsters Local 901. On the same day, Chavez wired Mejias that the directors of Local 901 had decided at a meeting to accept the members of ILO as members of Teamsters' Local 901. Chavez sent to Bailey a copy of his telegram to Mejias and informed him that he would negotiate the collective-bargaining contract on behalf of the ILO

members. Bailey notified Chavez that if the ILO wished the Teamsters Local 901 to bargain for it, there would have to be an amendment to the Board certification issued to ILO. In the morning of August 16, 1962, Teamsters Local 901 established a picket line at respondent's Ponce terminal. Some of the picket sign legends read, "Teamsters' 901 demand recognition of union certification"; "Do not cross the picket line"; "Teamsters demand Sea-Land reinstate workers of certified union"; "Sea-Land discriminates against its employees in violation of the law." Several of the signs had legends referring to the ILO. The picketing with legends identifying Teamsters Local 901 was discontinued that same morning. On August 18 Chavez met with Bailey and other officials of the respondent as well as with Bradley of the ILA. Nothing appears to have been decided. On August 24, 1962, Bailey telegraphed Mejias in reply to the latter's request that they meet to negotiate a contract on August 24. Bailey informed him that respondent was willing to negotiate with ILO pursuant to the Board certification, but in view of Chavez' notice of August 2 he was of the opinion that there should be some advice from the Board as to what respondent should do. On August 28, Teamsters Local 901 informed Mejias through Chavez that its directors at a meeting on August 25 had revoked its resolution of August 2 accepting ILO members as members of Teamsters, and also informed the Board's regional office and Bailey that it was not interested in bargaining with respondent in behalf of ILO. On August 29, Mejias wired Bailey a request that they meet and bargain on August 30 in view of the action taken by Teamsters Local 901 on August 25 and 28.

■ The foregoing facts are supported by substantial evidence, and justify the Board's conclusion that there was no abandonment by ILO of its status as the certified collective-bargaining representative of respondent's Ponce employees.

Respondent claims that it was not guilty of a failure to bargain collectively. Among the findings, conclusions, and recommendations of the Trial Examiner adopted by the Board is the following:

"I do not find that Respondent generally refused to bargain in violation of Section 8(a) (5) of the Act, as there is no allegation of a general refusal to bargain in the complaint, and the General Counsel expressly takes the position that such a violation is not within the scope of his theory of the case. * * * This issue was fully litigated by Charging Party, respondent and unintentionally by General Counsel. His evidence on this issue was inextricably enmeshed with evidence involving other issues. The evidence of record shows that Respondent engaged in surface bargaining only with respect to wages, hours, and working conditions, until December 27, 1962. * * * There is merit to Respondent's position that it had doubts as to the identity of the bargaining agent during the interim period of August 2 to August 30, 1962, as it was not clear during that time whether the identity of ILO, the certified union, had been lost by what turned out to be a temporary merger with Teamsters Local 901. * * * However, the course of its conduct was not steered in the direction of good faith bargaining until December 27. The record as a whole discloses that the remedy should include a cautionary order to bargain generally, under the broad provisions of Section 8(a) (1) of the Act."

It is quite plain from the respondent's dilatory tactics, continual stalling, failure of Bailey, its representative, to keep appointments made with the representative of the ILO, the assignment of an individual who lacked authority to negotiate with the ILO representative, viewed in the light of other conduct of the respondent designed to undermine and destroy ILO as collective-bargaining

representative of respondent's Ponce employees, that respondent, though going through some of the motions, did not bargain, and had no intention of bargaining, in good faith[6] with ILO with respect to wages, hour, work assignment, or other terms and conditions of employment, or changes in respondent's operations which affected these matters.

■ Respondent finally contends that the Board violated Section 5(b) of the Administrative Procedure Act[7] in refusing to consider an offer of settlement.

At the hearing before the Trial Examiner counsel for the respondent represented that he had "submitted to the Acting Regional Director of this field, with a copy to the National Labor Relations Board on January 11, 1963, a proposed settlement of the case which is now before you and I have in my possession a copy of the letter."

No copy of the letter was put in evidence and no offer of proof was made. There is nothing in the record to indicate what was stated in the letter. Respondent's brief is likewise silent on the contents of the letter and the nature of the offer.

In Michigan Consolidated Gas Co. v. Federal Power Commission, 1960, 108 U.S.App.D.C. 409, 283 F.2d 204, the case relied upon by the respondent, a settlement proposal was submitted to the Commission and the Commission refused to consider it "whatever its merits." The proposal itself was before the Court, and was considered by the Court, prima facie, to have merit enough to have required the Commission at some stage of the proceeding to consider it on its own initiative.

In the case before us the respondent has chosen to withhold from the Court all information concerning the contents of its offer of settlement.

There is nothing of substance in the record to support respondent's charge that the Board violated the Administrative Procedure Act.

We are persuaded from a careful study of the entire record that the findings of fact made by the Board are supported by substantial evidence on the record considered as a whole and that they in turn supply a rational basis for the ultimate findings and conclusions and for the order.

A decree will be entered enforcing the order of the Board.

---

6. Section 8(d) of the Act (29 U.S.C. § 158(d)) provides as follows:

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *."

7. This section of the Administrative Procedure Act (5 U.S.C. § 1004(b)) provides as follows:

"The agency shall afford all interested parties opportunity for (1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment where time, the nature of the proceeding, and the public interest permit, and (2) to the extent that the parties are unable so to determine any controversy by consent, hearing, and decision upon notice and in conformity with sections 1006 and 1007 of this title."